# NANCY G. ET AL. *v.* DEPARTMENT OF CHILDREN AND FAMILIES
## (SC 15952)

Callahan, C. J., and Borden, Berdon, Norcott, Palmer, McDonald and Peters, Js.

Argued November 3, 1998—officially released May 18, 1999

*Martha Stone*, with whom were *Marsha Lawson*, law student intern, and, on the brief, *Martin B. Margulies*, for the appellants (plaintiffs).

*Eliot D. Prescott*, assistant attorney general, with whom were *Gregory T. D'Auria*, assistant attorney general, and, on the brief, *Richard Blumenthal*, attorney general, and *Susan T. Pearlman* and *Carolyn Queri-jero*, assistant attorneys general, for the appellee (defendant).

*Opinion*

CALLAHAN, C. J. The plaintiff, Nancy G., appeals from a decision of the adoption subsidy review board (board) denying her request for a postadoption subsidy for her son, Jonathan.[1] The statutes governing adoption subsidies provide that in order to be eligible for an adoption subsidy, a child either must be a ward of the commissioner of children and families (commissioner) or must be *"placed" by a licensed child-placing agency*. See General Statutes §§ 17a-116 and 17a-117.[2] The dispositive issue in this appeal is whether Jewish Family

[1] Jonathan also is a plaintiff in the present action. In this opinion, all references to the plaintiff are to Nancy G.

[2] General Statutes § 17a-116 provides in relevant part: "[A] 'special needs' child is a child who is a ward of the Commissioner of Children and Families or is to be placed by a licensed child-placing agency and is difficult to place in adoption because of one or more conditions including, but not limited to, physical or mental disability, serious emotional maladjustment, a recognized high risk of physical or mental disability, age or racial or ethnic factors which present a barrier to adoption or is a member of a sibling group which should be placed together, or because the child has established significant emotional ties with prospective adoptive parents while in their care as a foster child and has been certified as a special needs child by the Commissioner of Children and Families."

General Statutes § 17a-117 provides in relevant part: "(a) If (1) a child for whom adoption is indicated, cannot, after all reasonable efforts consistent with the best interests of the child, be placed in adoption through existing sources because the child is a special needs child and (2) the

Service of New Haven, Inc. (Jewish Family Service), the only licensed child-placing agency involved in Jonathan's adoption, "placed" Jonathan for adoption within the meaning of § 17a-116. We conclude that it did not and that the plaintiff, therefore, is not eligible to receive a postadoption subsidy.

The following undisputed facts are relevant to this appeal. In 1980, the plaintiff, a resident of New Haven, sought to adopt a child through the International Mission of Hope in India. At that time, the International Mission of Hope was affiliated with Crossroads, Inc. (Crossroads), an adoption agency located in Minnesota. Crossroads provided education and guidance to persons who were interested in adopting a child from India and assisted the prospective adoptive parent or parents in the adoption process. The role of the International Mission of Hope was to identify children in India for

adopting family meets the standards for adoption which any other adopting family meets, the Commissioner of Children and Families shall, before adoption of such child by such family, certify such child as a special needs child and, after adoption, provide one or more of the following subsidies for the adopting parents: (A) A special-need subsidy . . . or (B) a periodic subsidy . . . and (C) in addition to the subsidies granted under this subsection, any medical benefits which are being provided prior to final approval of the adoption by the Court of Probate . . . . The amount of a periodic subsidy shall not exceed the current costs of foster maintenance care.

"(b) Requests for subsidies after a final approval of the adoption by the Court of Probate may be considered at the discretion of the commissioner for conditions resulting from or directly related to the totality of circumstances surrounding the child prior to placement in adoption. . . . Any subsidy decision by the Commissioner of Children and Families may be appealed by a licensed child-placing agency or the adopting parent or parents to the Adoption Subsidy Review Board established under subsection (c) of this section. . . .

"(c) There is established an Adoption Subsidy Review Board to hear appeals under this section, section 17a-118 and section 17a-120. The board shall consist of the Commissioner of Children and Families, or his designee, and a licensed representative of a child-placing agency and an adoptive parent appointed by the Governor. . . . All decisions of the board shall be based on the best interest of the child. Appeals under this section shall be in accordance with the provisions of chapter 54."

adoption and, once a child had been located for particular prospective parents, to institute guardianship proceedings in an Indian court on behalf of the prospective parents so that the child could be brought to the United States and adoption proceedings could be commenced in a court of competent jurisdiction in the United States.

The International Mission of Hope and Crossroads provided the plaintiff with general informational letters regarding Indian children available for adoption. On November 25, 1980, although the International Mission of Hope had not yet located a child for her, the plaintiff executed several documents that would be required to allow the International Mission of Hope to institute a guardianship proceeding on her behalf in an Indian court once a child had been identified. Specifically, the plaintiff signed a declaration stating her intent to take guardianship of an Indian child for prospective adoption, a power of attorney, a bond, an affidavit and a blank guardianship agreement.

In May, 1981, in an effort to regionalize its services, the International Mission of Hope also became affiliated with Americans for International Aid and Adoption, an adoption agency located in Michigan. The plaintiff subsequently requested that Crossroads forward her adoption file to Americans for International Aid and Adoption. Neither the International Mission of Hope nor Americans for International Aid and Adoption was licensed by the state of Connecticut.

Immigration regulations require that in order for a foreign-born child to enter the United States for purposes of adoption, the child's visa application must be supported by a home study of the prospective adoptive home. On June 1, 1981, noting that the International Mission of Hope had requested that Americans for International Aid and Adoption "complete the [plaintiff's] adoption of an Indian child" and that the home studies

contained in the plaintiff's adoption file were over one year old, Americans for International Aid and Adoption contacted Jewish Family Service and made arrangements for that organization to provide an "update . . . concerning any changes with the [plaintiff's] family." Jewish Family Service thereafter prepared an updated home study of the plaintiff's home and sent a copy of that study to the Hartford office of the Immigration and Naturalization Service (INS). At that time, Jewish Family Service informed the immigration authorities that the plaintiff "[met] the preadoption requirement of Connecticut. She originally [was] working through Crossroads, but the case has been transferred to Americans for International Aid and Adoption . . . . This agency is being approved in Connecticut."

On December 7, 1981, Jewish Family Service sent a copy of an additional home study report it had prepared to the INS. At that time, Jewish Family Service notified the INS that the agency with which the plaintiff was working, Americans for International Aid and Adoption, had become a Connecticut "approved" child-placing agency.

Jonathan was born in Calcutta, India, on December 24, 1981. Born ten to twelve weeks prematurely and weighing approximately three pounds, he was abandoned by his biological mother. Authorities at the facility where Jonathan was born placed him in the care and custody of the International Mission of Hope. After Jonathan had been identified as suitable for adoption by the plaintiff, the International Mission of Hope instituted a proceeding in an Indian court seeking to have the plaintiff declared Jonathan's guardian. On January 20, 1982, the court in India appointed the plaintiff as Jonathan's guardian and granted permission for him to be taken to the United States for purposes of adoption.

That same day, Americans for International Aid and Adoption sent Jonathan's birth certificate and a copy

of the guardianship petition that had been filed in the Indian court to Jewish Family Service for the plaintiff's use in obtaining a visa for Jonathan. Americans for International Aid and Adoption also requested that the plaintiff pay its processing fee and noted that she would be billed separately by the International Mission of Hope. On February 2, 1982, Americans for International Aid and Adoption sent to Jewish Family Service the guardianship decree that named the plaintiff as Jonathan's guardian and that granted permission for Jonathan to be taken to the United States for purposes of adoption. Americans for International Aid and Adoption requested that the Jewish Family Service "[p]lease have [the plaintiff] call us with visa approval and remind her that our processing fee is due before the child arrives."

Jonathan arrived in the United States on March 2, 1982, and he was met at the airport by the plaintiff. The next day, Americans for International Aid and Adoption notified Jewish Family Service that Jonathan had "arrived and was placed" with the plaintiff.

On October 7, 1982, the plaintiff filed an application in the Probate Court for the district of New Haven requesting that Jewish Family Service be appointed Jonathan's statutory parent. The next day, Jewish Family Service filed an affidavit confirming that the plaintiff had received legal guardianship of the child from a court in India. On December 10, 1982, the Probate Court terminated the plaintiff's guardianship and appointed Jewish Family Service as Jonathan's statutory parent.

Jewish Family Service then filed a statutory parent adoption application in the Probate Court seeking to have the plaintiff declared Jonathan's adoptive mother. The adoption report filed with Probate Court stated that *Jonathan had been placed in the proposed adoptive home on March 2, 1982*—the date on which he arrived in the United States and was met at the airport by

the plaintiff. The Probate Court granted the proposed adoption on February 14, 1983. From the time he entered this country until his adoption was finalized, Jonathan remained in the physical custody of the plaintiff.

More than a decade later, in June, 1995, the plaintiff filed an application with the commissioner for a post-adoption subsidy pursuant to § 17a-117 (b).[3] The commissioner denied her application. The plaintiff then exercised her right to a hearing before the board. See General Statutes § 17a-117 (b) and (c).[4] After a hearing, on February 2, 1997, the board, citing testimony that Americans for International Aid and Adoption was the agency that had placed Jonathan for adoption, concluded that, as a matter of law, "Jonathan did not . . . meet . . . the threshold test for classification as a 'special needs' child . . . ." Consequently, the board denied the plaintiff's request for a postadoption subsidy.

Thereafter, the plaintiff appealed from the decision of the board to the Superior Court pursuant to General Statutes § 4-183 (a). The court concluded that the plaintiff was not eligible for a postadoption subsidy because, inter alia, Jonathan had not been "placed" for adoption by a child-placing agency licensed in Connecticut as required by § 17a-116. The court, therefore, dismissed the plaintiff's appeal. The plaintiff appealed from the

---

[3] General Statutes § 17a-117 (b) provides in relevant part: "Requests for subsidies after a final approval of the adoption by the Court of Probate may be considered at the discretion of the commissioner for conditions resulting from or directly related to the totality of circumstances surrounding the child prior to placement in adoption. . . . "

[4] General Statutes § 17a-117 provides in relevant part: "(b) . . . Any subsidy decision by the Commissioner of Children and Families may be appealed by a licensed child-placing agency or the adopting parent or parents to the Adoption Subsidy Review Board established under subsection (c) of this section. . . .

"(c) There is established an Adoption Subsidy Review Board to hear appeals under this section, section 17a-118 and section 17a-120. . . . "

judgment of the trial court to the Appellate Court pursuant to General Statutes §§ 4-184 and 51-197b. We then transferred the appeal to this court pursuant to Practice Book § 65-1 and General Statutes § 51-199 (c).

On appeal, the plaintiff maintains, inter alia, that the trial court improperly concluded that Jonathan had not been "placed" for adoption by a licensed child-placing agency.[5] Specifically, the plaintiff maintains that: (1) in granting Jonathan's adoption, the Probate Court determined that Jonathan had been "placed" for adoption by Jewish Family Service, a licensed agency, and that the doctrine of res judicata therefore precluded the board from relitigating that issue; and (2) the trial court improperly concluded that the activities undertaken by Jewish Family Service in its capacity as Jonathan's statutory parent did not constitute "placement" within the meaning of § 17a-116. We disagree with both of the plaintiff's claims.

I

The plaintiff first contends that the board was precluded from litigating the issue of whether Jonathan was "placed" for adoption by a licensed child-placing agency. Specifically, the plaintiff maintains that prior to granting Jonathan's adoption, the Probate Court was required to determine that Jonathan had been "placed for adoption by the Commissioner . . . or a child-placing agency"; General Statutes § 45a-727 (a) (3) (A); see also General Statutes (Rev. to 1981) § 45-63 (a) (3); and that the doctrine of res judicata therefore precluded the board from relitigating the issue of which agency, Jewish Family Service or Americans for International Aid and Adoption, had "placed" Jonathan for adoption.

---

[5] Because our conclusion that the activities performed by Jewish Family Service in connection with Jonathan's adoption did not constitute "placement" for adoption within the meaning of § 17a-116 is dispositive of this appeal, we do not address the plaintiff's other claims.

The statutory scheme that governs statutory parent adoptions provides in relevant part that a statutory parent adoption application "shall not be accepted by the Court of Probate unless . . . the child sought to be adopted has been placed for adoption by the Commissioner . . . or a child-placing agency . . . ." General Statutes § 45a-727 (a) (3) (A), formerly General Statutes (Rev. to 1981) § 45-63 (a) (3). The plaintiff correctly reasons, therefore, that if Jonathan had not been "placed for adoption by the Commissioner . . . or a child-placing agency," the Probate Court would have lacked authority to grant his adoption. That proposition, however, does not compel a conclusion that the Probate Court determined that it was Jewish Family Service, the only licensed child-placing agency involved in the adoption, that "placed" Jonathan. In fact, Jonathan's adoption records do not indicate that the court identified which agency had "placed" Jonathan for adoption. Moreover, for purposes of the placement requirement of § 45a-727 (a) (3), "child-placing agency" is defined as "any agency within or without the state of Connecticut licensed *or approved* by the Commissioner . . . ." (Emphasis added.) General Statutes § 45a-707 (3).[6] Thus, the most that can be inferred from the Probate Court's granting of Jonathan's adoption is that the court either determined that he had been "placed" for adoption by a licensed child-placing agency (i.e., Jewish Family Service) or that he had been "placed" for adoption by an approved out-of-state child-placing agency (i.e., Americans for International Aid and Adoption).[7] There is nothing in the record to indicate that Americans for International Aid and Adoption, the out-of-state child-placing agency involved in Jonathan's adoption,

[6] See also General Statutes (Rev. to 1981) § 45-61b (c).

[7] Only a licensed agency may place a Connecticut child. Children from other jurisdictions, however, may be placed by a licensed agency or by an approved out-of-state agency. *Easter House, Inc.* v. *Dept. of Children & Youth Services*, 214 Conn. 560, 571–72, 573 A.2d 304 (1990).

was not an "approved" child-placing agency. Moreover, the documents provided to the INS by Jewish Family Service indicate that Americans for International Aid and Adoption became an approved child-placing agency prior to Jonathan's birth and the International Mission of Hope's institution of the guardianship proceeding in the Indian court. The Probate Court decree granting Jonathan's adoption, therefore, is susceptible of two conclusions regarding which child-placing agency was in fact the agency that "placed" Jonathan for adoption. Although the Probate Court may have determined that Jonathan had been placed by Jewish Family Service, a Connecticut licensed agency, the court also may have concluded that Jonathan had been placed by Americans for International Aid and Adoption and that Americans for International Aid and Adoption was an approved, but unlicensed, child-placing agency.

"Claim preclusion (res judicata) and issue preclusion (collateral estoppel) have been described as related ideas on a continuum. [C]laim preclusion prevents a litigant from reasserting a claim that has already been decided on the merits. . . . [I]ssue preclusion, prevents a party from relitigating an issue that has been determined in a prior suit. *Virgo* v. *Lyons*, 209 Conn. 497, 501, 551 A.2d 1243 (1988), quoting *Gionfriddo* v. *Gartenhaus Cafe*, 15 Conn. App. 392, 401–402, 546 A.2d 284 (1988), aff'd, 211 Conn. 67, 557 A.2d 540 (1989)." (Internal quotation marks omitted.) *Mazziotti* v. *Allstate Ins. Co.*, 240 Conn. 799, 812, 695 A.2d 1010 (1997); *Crochiere* v. *Board of Education*, 227 Conn. 333, 343, 630 A.2d 1027 (1993).

The plaintiff's preclusion claim, therefore, is properly characterized as an invocation of the doctrine of collateral estoppel rather than of the doctrine of res judicata. Collateral estoppel, however, is capable of precluding a party from relitigating only issues and facts that actually

and necessarily were determined in an earlier proceeding. *Mazziotti* v. *Allstate Ins. Co.*, supra, 240 Conn. 812; *Weiss* v. *Statewide Grievance Committee*, 227 Conn. 802, 818, 633 A.2d 282 (1993); *DeLaurentis* v. *New Haven*, 220 Conn. 225, 239, 597 A.2d 807 (1991). Because the record does not indicate that the Probate Court determined that Jonathan had been "placed" for adoption by Jewish Family Service rather than by Americans for International Aid and Adoption, we conclude that the doctrine of collateral estoppel did not preclude the board from litigating the issue of which agency, Jewish Family Service or Americans for International Aid and Adoption, "placed" Jonathan for adoption.

## II

The plaintiff next claims that the trial court improperly determined that Jonathan had not been "placed" for adoption by a licensed child-placing agency. Specifically, the plaintiff maintains that, as a matter of law, Jonathan was "placed" for adoption by Jewish Family Service because Jewish Family Service acted as Jonathan's statutory parent. We disagree.

As a threshold matter, we must determine the applicable standard of review. "Ordinarily, this court affords deference to the construction of a statute applied by the administrative agency empowered by law to carry out the statute's purposes. . . . [A]n agency's factual and discretionary determinations are to be accorded considerable weight by the courts." (Internal quotation marks omitted.) *Connecticut Assn. of Not-for-Profit Providers for the Aging* v. *Dept. of Social Services*, 244 Conn. 378, 389, 709 A.2d 1116 (1998); *Connecticut Light & Power Co.* v. *Texas-Ohio Power, Inc.*, 243 Conn. 635, 642, 708 A.2d 202 (1998); *Dept. of Administrative Services* v. *Employees' Review Board*, 226 Conn. 670, 678, 628 A.2d 957 (1993). "Cases that present pure questions of law, however, invoke a broader standard of

review than is ordinarily involved in deciding whether, in light of the evidence, the agency has acted unreasonably, arbitrarily, illegally or in abuse of its discretion." (Internal quotation marks omitted.) *Connecticut Assn. of Not-for-Profit Providers for the Aging* v. *Dept. of Social Services*, supra, 389; *Connecticut Light & Power Co.* v. *Texas-Ohio Power, Inc.*, supra, 642; *Dept. of Administrative Services* v. *Employees' Review Board*, supra, 678. "Furthermore, when a state agency's determination of a question of law has not previously been subject to judicial scrutiny . . . the agency is not entitled to special deference." (Internal quotation marks omitted.) *Connecticut Assn. of Not-for-Profit Providers for the Aging* v. *Dept. of Social Services*, supra, 389; *Connecticut Light & Power Co.* v. *Texas-Ohio Power, Inc.*, supra, 642; *Dept. of Administrative Services* v. *Employees' Review Board*, supra, 678–79. The meaning of the term "placed" in § 17a-116 has not been subject previously to judicial review and is a pure question of law involving the interpretation of the relevant statutory provisions. Consequently, we afford no special deference to the board's interpretation of the term "placed" in § 17a-116.

In interpreting statutes, we are guided by well established tenets of statutory construction. "[O]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In seeking to discern that intent, we look to the words of the statute itself, to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter." (Internal quotation marks omitted.) *In re Baby Z.*, 247 Conn. 474, 498, 724 A.2d 1035 (1999); *Poulos* v. *Pfizer, Inc.*, 244 Conn. 598, 605, 711 A.2d 688 (1998); *Connecticut National Bank* v. *Giacomi*, 242 Conn. 17, 32, 699 A.2d 101 (1997).

Our point of departure is the language of the relevant adoption statutes. Connecticut law provides for only three types of adoptions: (1) statutory parent adoptions; (2) stepparent adoptions; and (3) blood relative adoptions. General Statutes § 45a-724; see also *In re Baby Z.*, supra, 247 Conn. 499. A statutory parent is defined as "the [commissioner] or the child-placing agency appointed by the court for the purpose of giving a minor child . . . in adoption . . . ." General Statutes § 45a-707 (7). A child-placing agency, in turn, is defined as "any agency within or without the state of Connecticut licensed or approved by the Commissioner . . . ." General Statutes § 45a-707 (3); see footnote 7 of this opinion. The Probate Court, moreover, may not approve a statutory parent adoption unless one of two requirements has been satisfied: (1) the child has been "placed" for adoption by the commissioner or by a child-placing agency; see General Statutes § 45a-727 (a) (3) (A); or (2) the adoption review board has granted a waiver of the requirement that the child be "placed" for adoption by the commissioner or a child-placing agency.[8] General Statutes § 45a-727 (a) (3) (B); see also *In re Baby Z.*, supra, 497.

With respect to adoption subsidies, § 17a-117 provides in relevant part: "(a) If . . . a child for whom adoption is indicated, cannot, after all reasonable efforts consistent with the best interests of the child, be placed in adoption . . . because the child is a *special needs child* . . . the Commissioner of Children and Families shall . . . certify such child as a *special needs child* and, after adoption, provide one or more of the following subsidies for the adopting parents . . . [a] special-need subsidy . . . a periodic subsidy . . .

---

[8] At the time of Jonathan's adoption, the adoption statutes did not provide for a waiver of the requirement that the child sought to be adopted be placed by the commissioner or a child-placing agency. See General Statutes (Rev. to 1981) § 45-63 (a) (3).

and . . . [a medical subsidy] . . . . (b) Requests for subsidies after a final approval of the adoption by the Court of Probate may be considered at the discretion of the commissioner for conditions resulting from or directly related to the totality of circumstances surrounding the child prior to placement in adoption. . . ." (Emphasis added.) For purposes of § 17a-117, a "special needs child" is defined as "a child who is a ward of the Commissioner . . . or is to be *placed by a licensed child-placing agency* and is difficult to place in adoption because of one or more conditions including, but not limited to, physical or mental disability, serious emotional maladjustment, a recognized high risk of physical or mental disability, age or racial or ethnic factors which present a barrier to adoption . . . and has been certified as a special needs child by the Commissioner of Children and Families." (Emphasis added.) General Statutes § 17a-116.[9]

In order to become a Connecticut-*licensed* child-placing agency, an agency must maintain an office in the state of Connecticut. See General Statutes § 17a-151 (a) ("Before issuing any license, the commissioner shall give to the selectmen of the town wherein such licensee proposes to carry on the licensed activity ten days' notice . . . . The commissioner shall also provide . . . periodical inspections . . . ."). An out-of-state child-placing agency may become a Connecticut-*approved* agency, but, because it does not maintain an in-state office, it cannot be licensed by the commissioner. General Statutes § 17a-151; see also Regs., Conn. State Agencies § 17a-150-121. Thus, although children from other jurisdictions may be "placed" for adoption by an "approved" out-of-state child-placing agency; see General Statutes § 45a-727 (a) (3); those children do not

---

[9] The plaintiff does not dispute that Jonathan was never a ward of the commissioner or that in order to qualify for an adoption subsidy, he must have been "placed" for adoption by a licensed child-placing agency.

qualify as "special needs" children within the meaning of § 17a-116 because their "placement" for adoption is not made by a licensed child-placing agency. Consequently, their adoptive parents are not eligible to receive an adoption subsidy from the state of Connecticut pursuant to § 17a-117.

The plaintiff maintains that, as a matter of law, the activities undertaken by Jewish Family Service in its capacity as Jonathan's statutory parent constituted "placement" of Jonathan for adoption. We previously have concluded, however, that the term "placement" in the adoption statutes; see General Statutes § 45a-727 (a) (3); refers to the process by which prospective adoptive parents obtain physical custody of a child, and that it does not refer to the process by which a statutory parent "gives" the child in adoption to the adoptive parents. See *In re Baby Z.*, supra, 247 Conn. 526. "[T]he legislature is presumed to exercise its statutory authority . . . with the intention of creating one consistent body of law. . . . An identical term used in [statutory provisions] pertaining to the same subject matter should not be read to have differing meanings unless there is some indication from the legislature that it intended such a result." (Internal quotation marks omitted.) Id., 500; *Board of Public Utilities Commissioners* v. *Yankee Gas Services Co.*, 236 Conn. 287, 295, 672 A.2d 953 (1996). Thus, the use of the term "placed" in § 17a-116 indicates that the legislature intended that in order for an adoption subsidy to be available, a Connecticut-licensed child-placing agency must transfer physical possession of the child to the prospective adoptive parents.

The language of § 17a-116, moreover, specifically excludes from the definition of "special needs children" children who are not placed for adoption in Connecticut by a licensed agency. Thus, the language of § 17a-116 excludes children who are placed by an out-of-state

child-placing agency—a clear indication that the legislature intended that Connecticut not provide adoption subsidies for children from other jurisdictions.

The legislative history of Substitute House Bill No. 5063, the bill that eventually was enacted as Public Acts 1972, No. 86, and now is codified as §§ 17a-116 and 17a-117, also evidences an intention that the adoption subsidy program be aimed at encouraging the adoption of special needs children who are in foster care in Connecticut. This rationale would not include adoption subsidies to children brought to Connecticut from other jurisdictions. See 15 H.R. Proc., Pt. 3, 1972 Sess., p. 1062, remarks of Representative Otha N. Brown ("[W]e would like to be able to facilitate the adoption process for hard to place children. *It would be saving the state a great deal of money by being able to find adoptive parents.*" [Emphasis added.]); 15 S. Proc., Pt. 3, 1972 Sess., p. 1279, remarks of Senator Anthony Ciarlone ("cost of such subsidy shall not exceed the cost of *foster maintenance*" [emphasis added]).

A construction of the term "placed" in § 17a-116 to mean "given in adoption by a statutory parent" would encompass every child given in adoption by a statutory parent, i.e., children from other jurisdictions whose statutory parent is an approved out-of-state child-placing agency as well as children whose statutory parent is a licensed in-state child-placing agency. Thus, construing the term "placed" in § 17a-116 to mean "given in adoption by a statutory parent" would contravene the legislative intent made manifest by both the language and the legislative history of §§ 17a-116 and 17a-117.

We conclude, therefore, that the term "placed" in § 17a-116 refers to the process by which physical custody of a child is transferred to prospective adoptive parents and that it does not refer to the process by which a child is given in adoption by a statutory parent.

The plaintiff does not dispute that Jewish Family Service, the only licensed child-placing agency involved in Jonathan's adoption, was not the child-placing agency responsible for transferring physical custody of Jonathan to the plaintiff. Because Jonathan was not placed for adoption by a licensed child-placing agency as required by § 17a-116, the plaintiff is not eligible to receive a postadoption subsidy for Jonathan.

The judgment is affirmed.

In this opinion BORDEN, NORCOTT, PALMER, MCDONALD and PETERS, Js., concurred.

BERDON, J., dissenting. Earlier this court year, the majority of this court imposed an agonizingly narrow and technical interpretation upon the laws that govern adoption in the state of Connecticut. Today, the majority travels further down this same path, with the apparent destination of frustrating the best interests of children. First, in *In re Baby Z.*, 247 Conn. 474, 724 A.2d 1035 (1999), the majority narrowly construed the relevant statutes in order to prevent a lesbian from adopting the biological child of her life partner, even though every person and entity involved in that case—including the state of Connecticut—agreed that the proposed adoption was in the child's best interests. In the present case, the majority distorts our law in order to deprive a child of much needed financial and medical subsidies. Moreover, it relies heavily upon a factual issue that (1) was not decided by the fact-finding administrative agencies and (2) blatantly contradicts the facts in the record. I cannot in all honesty say that this comes as a surprise.

I begin with a brief summary of the facts. In 1980, the plaintiff Nancy G. sought to adopt a child through the International Mission of Hope (Mission of Hope), an organization that identifies children from India for adoption. At the time, Mission of Hope was affiliated

with Crossroads, Inc. (Crossroads), a Minnesota adoption agency. Neither Mission of Hope nor Crossroads is authorized to place children in adoption in the state of Connecticut. In November of 1980—before a child was located for the plaintiff (and, in fact, before Jonathan[1] was even born)—the plaintiff completed the documentation required to permit Mission of Hope to institute a guardianship proceeding on her behalf in a court in India.

In May of the following year, Mission of Hope initiated a collaboration with Americans for International Aid and Adoption (International Aid), a Michigan adoption agency. Like Mission of Hope and Crossroads, International Aid is not authorized to place children in adoption in Connecticut.[2] Mission of Hope requested that International Aid complete the plaintiff's adoption of a child from India. Shortly thereafter, International Aid enlisted Jewish Family Service of New Haven, Inc. (Jewish Family Service), to conduct a study of the plaintiff's home. It is undisputed that Jewish Family Service is the only agency involved in the present case that is licensed to place children in adoption in Connecticut. Jewish Family Service conducted a home study, prepared a report explaining that the plaintiff satisfied "the preadoption requirement of Connecticut," and sent a copy to the United States Immigration and Naturalization Service. In early December, Jewish Family Service updated its study with a supplemental report.

During all of this activity, Jonathan had not yet been born. On Christmas Eve of 1981, a woman in Calcutta, India, attempted to procure an abortion during the third trimester of her pregnancy. The abortion was not successful: the child survived, even though he was three

---

[1] Jonathan, the child whom Nancy G. ultimately adopted, is also a plaintiff in this action. References in this dissent to the plaintiff, however, are to Nancy G.

[2] See footnote 12 of this dissent.

months premature and weighed only three pounds at birth. Nevertheless, his mother left him to die in the room where she had tried to abort him. The plaintiff ultimately adopted this child, Jonathan, for whom she now seeks a subsidy.

Mission of Hope obtained custody of Jonathan and instituted guardianship proceedings in a court in India. That court appointed the plaintiff as Jonathan's guardian on January 21, 1982, and granted permission for him to be taken to the United States to be adopted. International Aid forwarded the court's decree to Jewish Family Service, which enabled the plaintiff to obtain a visa for Jonathan. The plaintiff met Jonathan at the airport when he arrived in the United States.

When the plaintiff accepted Jonathan into her home, he suffered from severe medical problems, including pneumonia, salmonella, diarrhea, and chronic ear and respiratory infections. Several years later, Jonathan continued to suffer from pneumonia and ear infections. In addition, he was diagnosed with asthma, attention deficit disorder, auditory memory deficit and deficient growth factor. According to Jonathan's pediatrician, all of these problems are directly attributable to the combination of his genes and the circumstances surrounding his birth.

The Probate Court for the district of New Haven appointed Jewish Family Service to represent Jonathan as his statutory parent; the plaintiff's adoption of Jonathan was accomplished on February 14, 1983. Caring for Jonathan has not been easy. The plaintiff has been forced to secure loans, she has had a lien placed on her home, and she has held down as many as three separate jobs at one time. At one point, the plaintiff even took borders into her home. In the brief that she submitted to this court, the plaintiff explained that she "desperately needed" a postadoption subsidy in order

to reimburse her for some of these overwhelming expenses, and to pay for future expenses. This is clearly true. It is equally apparent that the subsidy is in Jonathan's best interests.

In June of 1995, it came to the plaintiff's attention that, pursuant to General Statutes § 17a-117, Connecticut has an adoption subsidy program for children with "special needs" (subsidy program).[3] The plaintiff applied for a subsidy to the commissioner of children and families (commissioner). The commissioner denied the application.[4] Pursuant to § 17a-117, the plaintiff appealed to the adoption subsidy review board (board). After hearing substantial evidence and making findings of fact, the

[3] At the time the plaintiff adopted Jonathan, neither the Probate Court nor Jewish Family Service advised her of the availability of a subsidy.

General Statutes § 17a-117 (a) provides in pertinent part: "If (1) a child for whom adoption is indicated, cannot, after all reasonable efforts consistent with the best interests of the child, be placed in adoption through existing sources because the child is a special needs child and (2) the adopting family meets the standards for adoption which any other adopting family meets, the Commissioner of Children and Families shall, before adoption of such child by such family, certify such child as a special needs child and, after adoption, provide one or more of the following subsidies for the adopting parents: (A) A special-need subsidy, which is a lump sum payment paid directly to the person providing the required service, to pay for an anticipated expense resulting from the adoption when no other resource is available for such payment; or (B) a periodic subsidy which is a payment to the adopting family; and (C) in addition to the subsidies granted under this subsection, any medical benefits which are being provided prior to final approval of the adoption by the Court of Probate in accordance with the fee schedule and payment procedures under the state Medicaid program administered by the Department of Social Services shall continue as long as the child qualifies as a dependent of the adoptive parent under the provisions of the Internal Revenue Code. . . ."

General Statutes § 17a-116 defines a "special needs" child as "a child who is a ward of the Commissioner of Children and Families or is to be placed by a licensed child-placing agency and is difficult to place in adoption . . . ."

[4] The commissioner supplied nothing more than the following conclusory sentence to explain the denial of the plaintiff's request for a subsidy: "This request is denied based on Section 17a-117 of the Connecticut General Statutes for conditions resulting from or directly related to the totality of circumstances surrounding the child prior to placement in adoption."

board affirmed the commissioner's decision on the ground that Jonathan was foreign-born, and thus ineligible for a subsidy even if he did have special needs.

The Superior Court dismissed the plaintiff's appeal from the board's decision on the ground that Jonathan had not been "placed" for adoption by Jewish Family Service, a factual issue that neither the commissioner nor the board had ever ruled upon. The majority of this court affirms the trial court's judgment on the identical ground.

## I

As a threshold matter, it is necessary to address a fundamental problem with the opinions of both the Superior Court and the majority. The issue before the fact-finding agencies in this administrative appeal was *not* whether Jonathan was "placed" by Jewish Family Service, but rather whether Jonathan was per se ineligible for the subsidy program because he was foreign-born. The policy that foreign-born children may not participate in the subsidy program lies at the core of the board's decision;[5] "placement" has nothing to do

[5] The board made it crystal clear in the "Rationale" portion of its memorandum that it denied assistance to the plaintiff because Jonathan was foreign-born. The board stated that "[t]he unique characteristics of this case specifically relat[e] to the question of [the] obligation of the state department of children and families [to grant] a financial/medical subsidy for a foreign-born infant." Moreover, the board explained its view that "the intent of the Adoption Subsidy program . . . is to provide for permanent, secure and committed homes for children *born in the United States* who might otherwise remain in foster care for the duration of their lives to adulthood. While it is recognized that an infant adoption in the United States may take many months or even years, the federal government seeks to engage families who are willing to take . . . *native born child(ren)* into their home as their own, and to appropriately compensate the family when certain circumstances exist that make that accomplishment difficult, if not improbable." (Emphasis added.) In addition, the board "expresse[d] concern and dismay as to why the Department of Children and Families would initiate a legislative action . . . entitled 'An Act Prohibiting Foreign Adoptions from Adoption Subsidies by the State' . . . when, in fact, the practice has been to deny such subsidies. Department Policy has clearly stated [that foreign-born

with it.[6]

Placement was never an issue in this case until it was raised on the plaintiff's appeal from the ruling of the administrative agency. Raising it at that late stage usurped the roles of the commissioner and the board, the fact finders in the present appeal. The commissioner made nothing more than a conclusory reference to "the totality of circumstances . . . ."[7] In the "Findings of

adoptees are not eligible for such subsidies] . . . . The Board can only conclude that the Department felt that existing law may be ambiguous, and sought to clarify [it] . . . . This Board, however, is quite clear in its understanding of existing federal and state law with respect to eligibility for financial subsidies . . . for foreign-born adoptees."

The majority claims that the board denied the plaintiff's request for a subsidy after "citing testimony that [International Aid] was the agency that had placed Jonathan for adoption . . . ." This is not true. Jean Watson, an employee of the department of children and families, opined before the board that Jonathan did not meet six separate "threshold *tests* for a special needs child." (Emphasis added.) In addition to describing four other tests, the board summarized Watson's opinions that: (1) Jonathan had never been certified as a special needs child and (2) International Aid placed Jonathan in adoption. As an afterthought to its lengthy statements about foreign-born children, the board added that "Jonathan did not, nor does now meet, the threshold *test* for classification as a 'special needs' child, pursuant to Ms. Watson's testimony." (Emphasis added.) The referent of this sentence is somewhat ambiguous. Presumably, the board was referring to Watson's statement that "Jonathan has never been certified as special needs . . . ." It is perfectly clear, however, that the board's allusion to one *test*—singular—does not mention Watson's opinion that International Aid placed Jonathan. More to the point, if the board had intended to premise its denial of a subsidy upon Watson's opinion as to who placed Jonathan, it knew very well how to do so.

[6] The majority avoids like the plague the premise upon which the board resolved this case: foreign-born children are per se ineligible for postadoption subsidies. See footnote 5 of this dissent. It is obvious to me that the majority ignores this premise because it is flagrantly unconstitutional, and would require reversal. See, e.g., *Barannikova* v. *Greenwich*, 229 Conn. 664, 684, 643 A.2d 251 (1994) (fourteenth amendment to United States constitution violated by laws that " '[impose] a lifetime hardship on a discrete class of children not accountable for their disabling status' " as illegal aliens). By ignoring the board's reliance upon the fact that Jonathan was foreign-born, the majority conveniently ducks the constitutional issue.

[7] See footnote 4 of this dissent.

Fact" portion of its decision denying a subsidy to the plaintiff, the board did *not* conclude—as the trial court did and the majority does—that Jewish Family Service did not place Jonathan in adoption with the plaintiff. Nor did the board rely upon such a determination in its "Rationale."[8]

It is well settled that "the determination of factual issues [is a matter] within the province of the administrative agency. *Lawrence* v. *Kozlowski*, 171 Conn. 705, 708, 372 A.2d 110 (1976), cert. denied, 431 U.S. 969, 97 S. Ct. 2930, 53 L. Ed. 2d 1066 (1977); *O'Donnell* v. *Police Commission*, 174 Conn. 422, 426, 389 A.2d 739 (1978); *Norwich* v. *Norwich Fire Fighters*, 173 Conn. 210, 214, 377 A.2d 290 (1977); *Balch Pontiac-Buick, Inc.* v. *Commissioner of Motor Vehicles*, 165 Conn. 559, 563, 345 A.2d 520 (1973); *Hotchkiss Grove Assn., Inc.* v. *Water Resources Commission*, 161 Conn. 50, 56, 282 A.2d 890 (1971)." (Internal quotation marks omitted.) *Feinson* v. *Conservation Commission*, 180 Conn. 421, 425–26, 429 A.2d 910 (1980); see *Huck* v. *Inland Wetlands & Watercourses Agency*, 203 Conn. 525, 542, 525 A.2d 940 (1987). Accordingly, when it reviewed the board's decision, the functional role of the trial court was identical to that of an appellate tribunal. The trial court was required to defer to the findings of the board; it did not possess the authority to contrive factual findings on appeal. Instead, the court was limited to determining whether the board's conclusions of fact were " 'unreasonable, arbitrary, illegal or an abuse of discretion.' " *Mattatuck Museum-Mattatuck Historical Society* v. *Administrator, Unemployment Compensation Act*, 238 Conn. 273, 276, 679 A.2d 347 (1996). It is for this reason that the trial court's memorandum of decision begins with a lengthy recital of the facts *"as found by the [board]*

---

[8] As discussed previously, the board denied the plaintiff's application for a subsidy solely because Jonathan was foreign-born. See footnote 5 of this dissent.

. . . ." (Emphasis added.) Because the trial court's determination that Jonathan was not placed by Jewish Family Service finds no support in either the record or the decision of the board, it constituted an abuse of discretion. By refusing to correct this error, the majority, in turn, abuses its discretion.

I recognize that it may be possible to dig through a record to cull out evidence in support of a factual matter. When that evidence was never at issue before the administrative agencies that sat as the finders of fact, however, it is grotesquely unfair for an appellate court to premise a holding upon it. Denying the plaintiff and her child a subsidy on the basis of a fact-bound issue that was never considered by either the commissioner or the board is nothing more than unprincipled, result driven opinion writing. The determination of who "placed" Jonathan for adoption was a factual question that neither the commissioner nor the board ever addressed, let alone resolved. The trial court and my colleagues in the majority have deprived both the plaintiff and her child of their right to be heard at a meaningful time and in a meaningful manner—one of the cornerstones of the constitutional right of due process under the law. *Rogers* v. *Commission on Human Rights & Opportunities*, 195 Conn. 543, 548–49, 489 A.2d 368 (1985) ("A fundamental requirement of due process is the opportunity to be heard. . . . It is an opportunity which must be granted at a meaningful time and in a meaningful manner." [Citation omitted; internal quotation marks omitted.]).

## II

For the reasons stated in part I of this dissent, the majority of this court violates the constitution by resolving the issue of whether Jonathan was "placed" for purposes of § 17a-117. I am equally certain that, on the merits, the majority is dead wrong. The majority makes

two claims: (1) the Probate Court did not necessarily determine that Jewish Family Service placed Jonathan with the plaintiff; and (2) if such a determination was made, it was erroneous. I address the flaws in each of these arguments in turn.

A

Like the trial court, the majority refuses to accord preclusive effect to the Probate Court's ruling that Jewish Family Service placed Jonathan in adoption with the plaintiff. This refusal cannot withstand scrutiny. It is a matter of black letter law that "collateral estoppel precludes a party from relitigating issues and facts actually and necessarily determined in an earlier proceeding between the same parties . . . ." *Weiss* v. *Statewide Grievance Committee*, 227 Conn. 802, 818, 633 A.2d 282 (1993); see *State* v. *Hope*, 215 Conn. 570, 584, 577 A.2d 1000 (1990), cert. denied, 498 U.S. 1089, 111 S. Ct. 968, 112 L. Ed. 2d 1054 (1991) ("[c]ollateral estoppel . . . may bar prosecution or argumentation of facts necessarily established in a prior proceeding" [internal quotation marks omitted]). "For an issue to be subject to collateral estoppel, it must have been fully and fairly litigated in the first action. It also must have been actually decided and the decision must have been necessary to the judgment. . . . *Virgo* v. *Lyons*, 209 Conn. 497, 501, 551 A.2d 1243 (1988); see also *Ashe* v. *Swenson*, 397 U.S. 436, 443, 90 S. Ct. 1189, 25 L. Ed. 2d 469 (1970); *State* v. *Hope*, [supra, 584]. An issue is *actually litigated* if it is properly raised in the pleadings or otherwise, submitted for determination, and in fact determined. . . . 1 Restatement (Second), Judgments § 27, comment (d) (1982). An issue is *necessarily determined* if, in the absence of a determination of the issue, the judgement could not have been validly rendered. F. James & G. Hazard, Civil Procedure (3d Ed. 1985) § 11.19. . . . *Jackson* v. *R. G. Whipple, Inc.*, 225 Conn. 705, 714–15, 627 A.2d 374 (1993)." (Citation omitted;

emphasis in original; internal quotation marks omitted.) *Carol Management Corp.* v. *Board of Tax Review*, 228 Conn. 23, 32–33, 633 A.2d 1368 (1993).

General Statutes § 45a-727 (a) (3) (A), formerly General Statutes (Rev. to 1981) § 45-63 (3),[9] provides in pertinent part that "[a]n application for the adoption of a minor child not related to the adopting parents shall not be accepted by the Court of Probate unless . . . the child sought to be adopted has been placed for adoption by . . . a child-placing agency . . . ." Because the Probate Court accepted the plaintiff's application for adoption in the present case, the Probate Court necessarily determined that Jonathan had been placed by a child-placing agency. Otherwise, the Probate Court would not have had subject matter jurisdiction over the adoption proceedings. The majority acknowledges this fact, but claims that the Probate Court did *not* necessarily determine that Jewish Family Service was the child-placing agency involved in this adoption. This strained argument is simply incorrect.

In order to place an out-of-state child in adoption, a child-placing agency must be either "licensed or approved by the Commissioner . . . ." General Statutes § 45a-707 (3), formerly General Statutes (Rev. to 1981) § 45-61b (c). In addition, the child-placing agency must "make an investigation and [submit a] written report" to the Probate Court. General Statutes § 45a-727 (b) (1). As the majority concedes, Jewish Family Service was the only child-placing agency involved in this adoption that was licensed in the state of Connecticut. There is no evidence that any other agency involved in this adoption was "approved" as that term of art

[9] While some of the statutes in effect at the time the plaintiff adopted Jonathan have been changed and recodified, the changes were primarily technical in nature. Initial references in this dissent to those affected statutes are to the current revision, with cross-references to the 1981 revision.

is employed in § 45a-707.[10] Moreover, Jewish Family Service is the only organization that conducted home study investigations and submitted written reports to the Probate Court, tasks required of the agency that places a child in adoption. All of this occurred more than ten years before anyone ever raised the issue of who placed Jonathan. It follows inexorably from these premises that the Probate Court necessarily determined that the child-placing agency that placed Jonathan with the plaintiff was Jewish Family Service.

This conclusion finds ample support in the record. More specifically, the application to the Probate Court for the appointment of a statutory parent lists Jewish Family Service as the only relevant "child-placing agency"; the decree of the Probate Court lists Jewish Family Service as the only relevant "child-placing agency"; and it was Jewish Family Service that petitioned the Probate Court for approval of the adoption agreement.

In its effort to evade the conclusion that the Probate Court necessarily determined that Jewish Family Service placed Jonathan, the majority makes the following argument: "There is nothing in the record to indicate that [International Aid], the out-of-state child-placing agency involved in Jonathan's adoption, was not an 'approved' child-placing agency."[11] Although the majority is technically correct in its doubly negative assertion that it is "not impossible" that International Aid theoretically *could have been* approved within the meaning of § 45a-707, there is not a shred of record evidence in support of the proposition that it was, *in fact,* so

---

[10] See footnote 12 of this dissent.

[11] Because of the practical and philosophical difficulty associated with proving the truth of a negative proposition, I cannot comprehend what sort of evidence the majority imagines the record might contain that would "indicate that [International Aid] . . . was *not* an 'approved' child-placing agency." (Emphasis added.)

approved.[12] Even if we were to assume for the sake of argument that International Aid were in fact authorized to place out-of-state children in Connecticut, there is not a shred of record evidence in support of the proposition that it conducted an investigation and submitted a written report to the Probate Court, as required by § 45a-727.[13] More importantly, there is not a shred of record evidence in support of the proposition that the Probate Court was *actually aware* of International Aid's hypothetical authorization.[14] Without such actual knowledge, the Probate Court could not possibly have determined that International Aid placed Jonathan with the plaintiff.

The fact is, the Probate Court identified Jewish Family Service as the only child-placing agency involved in

---

[12] In support of its claim that it is "not impossible" that the Probate Court theoretically could have determined that International Aid placed Jonathan with the plaintiff, the majority cites to "documents provided to [immigration authorities] by Jewish Family Service . . . ." These "documents" consist of a single two paragraph note—addressed "To Whom It May Concern" in the offices of the United States Immigration and Naturalization Service—written by a social worker affiliated with Jewish Family Service. (This note was a cover letter for an enclosed update to a prior home study conducted by Jewish Family Service.) In this note, the social worker elliptically asserts that International Aid "is approved in Connecticut." It is unclear what, precisely, the social worker is talking about. It is clear, however, that the social worker's assertion does not purport to establish that International Aid was "approved" as that term of art is used in § 45a-707. Even if I were to assume *arguendo* that the social worker believed that International Aid was approved within the meaning of § 45a-707, there is not a shred of record evidence that substantiates such a belief. Accordingly, it would not have been reasonable for the Probate Court to have relied upon this unsubstantiated belief, and there is no other source for the majority's conjecture that International Aid was authorized to place Jonathan with the plaintiff. More importantly, there is not a shred of record evidence suggesting that International Aid even attempted to place Jonathan with the plaintiff, whether or not it was authorized by law to do so. See part II B of this dissent for a discussion of the fact that Jewish Family Service placed Jonathan in adoption.

[13] In fact, International Aid enlisted the assistance of Jewish Family Service for the precise reason that it was incapable of performing these tasks.

[14] If there was any document either submitted to or released by the Probate Court in the present case that referred to International Aid, the state has elected not to include such a document in the record.

the adoption. The name of no other child-placing agency appears in the Probate Court records. It defies reason to believe that—if any agency other than Jewish Family Service had placed Jonathan—the Probate Court would have neglected to mention this jurisdictional fact somewhere in at least one official document. Accordingly, it is absurd for the majority to claim that the Probate Court could have determined that International Aid placed Jonathan. Because the only remaining possibility is that Jewish Family Service placed Jonathan,[15] the Probate Court necessarily must have reached this conclusion. The principles of collateral estoppel discussed previously require us to accord preclusive effect to this determination.

### B

Even if it were appropriate to disregard the preclusive effect of the Probate Court's finding, I nevertheless agree with the Probate Court that Jewish Family Service placed Jonathan in adoption with the plaintiff. Supplying a textbook example of the axiom that the one who frames the question wins the argument, the majority disposes of the merits of this case by framing the central issue in a disingenuous and unprincipled fashion.

My disagreement with the majority, however, could be cured by the insertion of eight words into the pertinent sentence: "The dispositive issue in this appeal is whether *under a liberal construction of the relevant statutes* Jewish Family Service . . . 'placed' Jonathan for adoption . . . ." (Emphasized text added.) Incredibly, the words "liberal construction" are nowhere to

---

[15] To reiterate, a child-placing agency cannot place a child in adoption in Connecticut unless it is either "licensed or approved" by the commissioner. Jewish Family Service was the only licensed agency involved in the adoption in the present case, and the majority does not even attempt to argue that any organization other than International Aid was approved within the meaning of § 45a-707.

be found in the majority opinion, even though the legislature has expressly mandated that several of the statutes that are relevant to this appeal "shall be liberally construed in the best interests of [the] child . . . ."[16] General Statutes § 45a-706, formerly General Statutes (Rev. to 1981) § 45-61a.[17]

The majority is simply incorrect to assert that—as a matter of law—Jewish Family Service did not place Jonathan.[18] In my view, the plain language of the relevant statutes precludes the result that the majority has reached. If I am incorrect, then the legislature's express mandate of liberal construction compels the conclusion that the plaintiff is eligible for the subsidy that she seeks.[19]

---

[16] As discussed in footnote 6 of this dissent, the majority also entirely ignores the plaintiff's argument that the state's classification denies economic benefits to legally admitted aliens on the basis of their alienage, and that this classification violates the federal constitution.

"Because statutory construction is informed by the presence of constitutional infirmities, this court reads statutes so as to avoid, rather than to create, constitutional questions. *In re Valerie D.*, 223 Conn. 492, 534, 613 A.2d 748 (1992). More specifically, '[i]n choosing between two statutory constructions, one valid and one constitutionally precarious, we will search for an effective and constitutional construction that reasonably accords with the legislature's underlying intent. . . . *In re Baby Girl B.*, 224 Conn. 263, 286, 618 A.2d 1 (1992). By refusing to acknowledge the unconstitutional consequences of the decision it renders today, the majority performs an end run around this basic axiom of statutory construction." (Internal quotation marks omitted.) *In re Baby Z.*, supra, 247 Conn. 561 (*Berdon, J.*, dissenting).

[17] General Statutes § 45a-706, formerly General Statutes (Rev. to 1981) § 45-61a, provides: "The provisions of sections 45a-706 to 45a-709, inclusive, 45a-715 to 45a-718, inclusive, 45a-724 to 45a-734, inclusive, 45a-736, 45a-737 and 52-231a shall be liberally construed in the best interests of any child for whom a petition has been filed under said sections."

[18] In the interest of clarity, I wish to explain that part II A of this dissent addresses the majority's erroneous conclusion that the Probate Court did not necessarily determine that Jewish Family Service placed Jonathan with the plaintiff. Part II B of this dissent addresses the majority's subsequent erroneous conclusion that—as a matter of law—Jewish Family Service did not in fact place Jonathan with the plaintiff.

[19] I interpret the majority's refusal to mention liberal construction—let alone engage in it—as a tacit concession that such a construction authorizes the postadoption subsidy that the plaintiff seeks.

The majority does not dispute that Jewish Family Service acted as Jonathan's statutory parent. In my view, this means that Jewish Family Service placed Jonathan in adoption.[20] In my dissent in *In re Baby Z.*, supra, 247 Conn. 539–56, I explained at great length why this is so. It would serve no useful purpose to rehash all of the details here. For present purposes, it suffices to make five observations.

First, Jewish Family Service began assisting the plaintiff *nearly six months before Jonathan was even born.* Under any rational interpretation of the word "place," Jewish Family Service was, from the very beginning, intimately involved with placing Jonathan in the plaintiff's home.

In order to authorize the plaintiff's adoption, the Probate Court had to appoint a statutory parent; it appointed Jewish Family Service. Prior to this appointment, it theoretically could have been argued that Jewish Family Service was "merely" one of four humanitarian agencies that were integral to the placement in this case (albeit the only one that was either licensed or approved in the state of Connecticut, and thus the only one authorized to place a child in this state).[21] Once the Probate Court appointed Jewish Family Service to serve as Jonathan's statutory parent, however, everything changed. Most importantly, all of the plaintiff's rights as Jonathan's temporary guardian were terminated. As Jonathan's statutory parent, Jewish Family Service had exclusive responsibility for placing him in a good home; neither the plaintiff nor any other child-placing agency had any legal rights whatsoever with respect to Jonathan. Jewish Family Service then

---

[20] As the majority acknowledges, it follows a fortiori from this latter conclusion that the plaintiff is eligible for a postadoption subsidy.

[21] As previously discussed, International Aid regarded the participation of Jewish Family Service as essential, which is why the former enlisted the latter to conduct home studies and submit written reports to the Probate Court.

placed Jonathan in adoption with the plaintiff.[22] It is of no moment that—prior to the time when Jewish Family Service was appointed to serve as Jonathan's statutory parent—certain unlicensed and unapproved organizations collaborated with Jewish Family Service in order to help the plaintiff become Jonathan's temporary guardian.[23] At the risk of appearing to endorse the majority's rhetorical strategy of splitting hairs at the microscopic level, I feel constrained to observe that § 17a-117 (b) refers to "placement in *adoption*." (Emphasis added.) Jonathan was not placed in adoption until Jewish Family Service performed that function as his statutory parent. Up until that point, the most that can be said is that Jonathan was placed in *guardianship* with the plaintiff.[24]

Second, the Probate Court, the General Statutes, and even the majority all refer to Jewish Family Service and similar organizations as "child-*placing* agencies," and for good reason: that is precisely what they do.[25] This

---

[22] To be perfectly clear, International Aid had absolutely no involvement with this case between the time when Jewish Family Service was appointed to serve as Jonathan's statutory parent and the time when Jewish Family Service placed Jonathan in adoption with the plaintiff.

[23] I cannot comprehend how the bare fact of collaboration could diminish the role that Jewish Family Service played. A number of facts are beyond dispute: (1) the Probate Court vested Jewish Family Service with exclusive authority to place Jonathan in a good home; (2) prior to this placement, the plaintiff's rights as Jonathan's guardian were terminated; and (3) prior to this placement, the plaintiff had no rights as an adoptive parent. It follows from these facts that Jewish Family Service—and no other organization—placed Jonathan in adoption with the plaintiff.

[24] To reiterate, Jewish Family Service was one of a handful of organizations that were intimately involved with this latter placement, and the only one that was either licensed or approved in Connecticut.

[25] In the decree appointing Jewish Family Service as a statutory parent, the Probate Court identified that organization as the sole "child-*placing* agency" relevant to the proposed adoption. (Emphasis added.)

General Statutes § 45a-727 (a) (3) (A) provides in part that "[a]n application for the adoption of a minor child not related to the adopting parents shall not be accepted by the Court of Probate unless . . . the child sought to be adopted has been *placed* for adoption by the . . . child-placing agency"

usage makes it perfectly clear that Jewish Family Service *placed* Jonathan with the plaintiff after it was appointed to serve as his statutory parent.[26]

Third, the majority mischaracterizes the record by emphasizing that "[t]he plaintiff does not dispute that Jewish Family Service . . . was not the child-placing agency responsible for transferring physical custody of Jonathan to the plaintiff." In fact, Justice Borden's "question" to counsel at oral argument—from which the so-called "admission" arises—included the affirmative declaration that, "obviously, [Jewish Family Service] was not the agency that transferred Jonathan to [the plaintiff]." To put it mildly, it would have been difficult for counsel to have disputed Justice Borden's firm belief regarding what was "obvious." Instead, counsel conceded that a representative of Jewish Family Service did not physically hand Jonathan to the plaintiff. Because the plaintiff's position was that "placement" does not mean "transfer of physical possession," this concession was of little significance.

Even if it did matter who physically transferred Jonathan to the plaintiff, the majority itself concedes in the first part of its opinion that the Probate Court—which was required to resolve the issue of placement in order to establish its jurisdiction—"may have determined that

---

that serves as a statutory parent. (Emphasis added.) General Statutes § 45a-764 (a), formerly General Statutes (Rev. to 1981) § 45-69d (a), authorizes the adoption review board to "waive the requirement that the minor child be *placed* by the . . . child-placing agency" that serves as a statutory parent. (Emphasis added.)

The majority itself consistently describes Jewish Family Service as a "child-*placing* agency." (Emphasis added.)

[26] As the majority acknowledges, quoting *In re Baby Z.*, supra, 247 Conn. 500: "[T]he legislature is presumed to exercise its statutory authority . . . with the intention of creating one consistent body of law. . . . An identical term used in [statutory provisions] pertaining to the same subject matter should not be read to have differing meanings unless there is some indication from the legislature that it intended such a result." (Internal quotation marks omitted.)

Jonathan had been placed by Jewish Family Service . . . ." That said, there is not a shred of record evidence that tends to suggest who physically transferred Jonathan from the airplane to the plaintiff. For all we know, it may have been a flight attendant employed by the airline. If that were the case, would the majority claim that it was the flight attendant who placed Jonathan in adoption?

Fourth, the legislature has expressly mandated that we must liberally construe certain relevant statutes "in the best interests of [the] child . . . ." General Statutes § 45a-706. "A liberal construction is one that 'expands the meaning of the statute to meet cases which are clearly within the spirit or reason of the law . . . provided such an interpretation is not inconsistent with the language used. It resolves all reasonable doubts in favor of the applicability of the statute to the particular case.' Black's Law Dictionary (6th Ed. 1990)." *In re Baby Z.*, supra, 247 Conn. 549 (*Berdon, J.*, dissenting). General Statutes §§ 45a-724 and 45a-727 are both covered by the legislature's express mandate. General Statutes § 45a-724 (a) (1), formerly General Statutes (Rev. to 1981) § 45-61i (1), provides in part that "[a] statutory parent . . . may . . . *give* in adoption to any adult person any minor child of whom [it] is the statutory parent . . . ." (Emphasis added.) It is beyond dispute that Jewish Family Service "gave" Jonathan in adoption. As I discussed at length in my dissent in *In re Baby Z.*, it is my view that a liberal construction of § 45a-724 compels the conclusion that "give" and "place" are synonymous—and hence interchangeable—in our adoption statutes. *In re Baby Z.*, supra, 549–50, 569 n.48. I will not repeat that analysis here. Section 45a-727 (a) (3) provides in part that "a child-placing agency may *place* a child in adoption who has been identified or located by a prospective parent . . . ." (Emphasis

added.) Accordingly, it is of no moment that other unlicensed and unapproved organizations may have collaborated with Jewish Family Service to help the plaintiff "identif[y]" and "locat[e]" Jonathan. Read together, these statutes supply strong support for the plaintiff's argument that Jewish Family Service placed Jonathan in adoption. "If there were any doubt about [this] conclusion . . . the mandate of liberal construction would be sufficient to dispel it." *In re Baby Z.*, supra, 551 (*Berdon, J.*, dissenting).

The statute that lies at the heart of the present case provides that "[r]equests for subsidies after a final approval of the adoption by the Court of Probate may be considered at the discretion of the commissioner for conditions resulting from or directly related to the totality of circumstances surrounding the child prior to *placement in adoption*. . . ."[27] (Emphasis added.) General Statutes § 17a-117 (b). When viewed through the lens supplied by the preceding liberal construction, Jewish Family Service "falls squarely within the orbit" of this language. *In re Baby Z.*, supra, 247 Conn. 550 (*Berdon, J.*, dissenting). Because Jewish Family Service placed Jonathan with the plaintiff, the commissioner had discretion to consider a subsidy to enable the plaintiff to afford the enormous medical expenses that she has incurred and will continue to incur on behalf of her adopted son. The majority does not attempt to deny that these expenses arise from "the totality of circumstances" surrounding Jonathan's suffering.[28]

---

[27] In the interests of full disclosure, I must mention two facts. First, the legislature did not specifically cross-reference either § 17a-116 or § 17a-117 in § 45a-706, the statute that mandates liberal construction of certain adoption statutes in the best interests of the child. Second, § 17a-116 provides that § 17a-117 applies only if the child was "placed by a *licensed* child-placing agency . . . ." (Emphasis added.) The majority does not, however, dispute that Jewish Family Service is a child-placing agency that has been licensed in Connecticut.

[28] That said, all of the details that the majority deems relevant about the totality of the circumstances surrounding Jonathan's birth are contained in

Fifth, I wish to reiterate that the majority has usurped the roles of the commissioner and the board, the fact finders in the present appeal. As I discussed in part I of this dissent, I believe that the trial court abused its discretion by reaching the issue of whether Jewish Family Service placed Jonathan in adoption. Instead of correcting this error, the majority compounds it.

In my view, the majority's refusal to describe the vital services performed by Jewish Family Service as "placement" stems from stubborn adherence to the views advanced by the majority in *In re Baby Z.*, not principled reasoning. Yet again, the majority has imposed a procrustean reading upon the statutes that govern adoption in the state of Connecticut. Yet again, the same majority that purports to defer to the will of the legislature has ignored the legislature's express mandate of liberal construction.

As I predicted in *In re Baby Z.*, "[f]uture generations will look back upon the majority's decision today with the same opprobrium with which we regard the draconian absurdities of the early English common law." Id., 536 (*Berdon, J.*, dissenting). Unfortunately, this observation will provide little solace to the plaintiff who attempted to assert her rights under the law in this case, a single mother to whom the majority has denied a subsidy that is unquestionably in the best interests of her long suffering son.

Accordingly, I dissent.

---

the following sentence: "Born ten to twelve weeks prematurely and weighing approximately three pounds, he was abandoned by his biological mother." For the reasons discussed previously, this sentence narrates only one small portion of Jonathan's story.