[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION RE MOTION TO SET ASIDE THE VERDICT (No. 177); MOTION FOR REMITTITUR (No. 183); MOTION TO SET ASIDE VERDICT AND FOR A NEW TRIAL (No. 184); AND MOTION TO SET ASIDE VERDICT AND FOR JUDGMENT NOTWITHSTANDING THE VERDICT (No. 185)
I. INTRODUCTION.
This is a medical malpractice case involving truly horrifying injury. For over thirteen years, William J. ("Billy") Jacobs, the young man at the center of the case, has, with awe-inspiring resilience, dedication, and humor, endured physical and mental injuries that few people could even imagine. As the result of what a jury has now determined to have been medical malpractice, Billy has been left blind and with profound impairments of his speech, the motor control of all four of his limbs, and his cognitive abilities. He must be intensively cared for by others throughout the remainder of his life. At the same time, he has been left with a more or less normal life expectancy and with an acute awareness of what has happened to him. Under these circumstances, the jury's award of $27 million in damages, while anecdotally the highest personal injury CT Page 11728 award in Connecticut legal history, is fair but not extravagant.
Following the jury's award, the parties filed numerous posttrial motions. Some of these motions essentially seek to reargue issues decided by the Court during the course of the trial. Since those issues have already been decided after considerable argument and deliberation, the Court's present discussion of them will be brief. Certain other posttrial issues have not been the subject of considered decision, and the Court's discussion of these issues will necessarily be more detailed. At the end of the day, as will be seen, all posttrial motions must be denied.
II. THE FACTUAL BACKGROUND.
On October 26, 1986, Billy Jacobs was a healthy, active 17-year-old boy living in upstate New York. On that date he was injured in a horrific automobile accident in the vicinity of his home that, as it turned out, changed his life forever. The accident was a high-speed head-on collision between two automobiles, each operated by a young driver. Billy was a passenger in one car, driven by Anthony Furnari. The other car was driven by Bradley Black. Black was drunk and speeding in the wrong lane. The cars collided at the top of a hill, under circumstances in which Furnari could have had little warning, although blood tests later revealed that Furnari had a substantial level of alcohol in his blood as well. Both drivers were killed in the crash, as was Billy's brother Christopher. Billy was seriously injured in the crash and so was another passenger, Camille Graff.
Billy was taken to Vassar Brothers Hospital in Poughkeepsie, New York, where he remained for 17 days. He had numerous serious fractures and internal injuries but no discernable brain damage. He was alert, talking, and breathing on his own. He had surgery to repair his injuries, but his subsequent improvement was unsatisfactory. He was, among other things, subject to recurring fevers and had a poor nutritional state. After 17 days, he was transferred to Yale-New Haven Hospital ("YNH") in Connecticut where, it was hoped, his condition would improve. As the tragic history of this case emphatically demonstrates, that hope was not to be realized.
Billy was admitted to YNH on November 12, 1986, and was subsequently given a number of diagnostic tests. The tests of importance to this case concern his aorta, the large artery that carries blood from the heart. The jury heard a great deal of evidence concerning the state of Billy's aorta in early November, 1986, and the nature of aortic repair surgery. The essence of this testimony can briefly be described. A high-speed automobile collision results in a tremendous amount of sudden force applied to the persons involved in the accident. That force can, among CT Page 11729 other things, result in a tear to the aorta. If such a tear has, in fact, occurred, there is a chance — perhaps an extremely high chance — that the aorta will rupture in the future with fatal results. It is possible to repair the tear surgically, by closing the tear with a stitch. This operation is, however, a complicated procedure. Stated very briefly, the chest cavity must be opened and the aorta clamped above the point of the tear to enable the surgeon to repair the tear itself. In November 1986, YNH decided that Billy Jacobs required such an operation.
The necessity of this procedure here was a disputed factual issue in the case. On November 13, 1986, Billy's aorta was examined by two different methods, yielding two different results. On the one hand, a CAT Scan indicated that his aorta was normal. On the other hand, an aortagram indicated, at least in the opinion of "[NH radiologists, a suspicion of an intimal tear. (There was contrary evidence that other physicians would not have read the aortagram in this way.) In 1986, an aortagram was considered the "gold standard" for viewing the interior of an aorta. "[Nil's chief cardiologist, Dr. John Elefteriades, decided to operate.
The operation took place on November 15, 1986. The skill with which the operation was conducted was a disputed factual issue in the case. The results of the surgery were unquestionably disastrous. A massive hemorrhage developed during the application of a clamp, and Billy Jacobs lost enormous quantities of blood. (The human body holds about 6 liters of blood; Billy lost 13 liters during the course of the operation.) His blood pressure was low for about 1 1/2 hours. During this time, Billy suffered catastrophic and irreversible brain damage with profound consequences for the rest of his life.
The relevant litigational history must now be described. In February 1988, Billy's parents, William W. Jacobs and Arlene Jacobs (the "Jacobs"), were appointed his conservators by a New York court. In May 1988, the Jacobs filed an action entitled Jacobs v. Amodeo (the "New York case") in the Supreme Court of New York for Dutchess County. The defendants in the New York case were the administrators of the deceased drivers of the two automobiles involved in the October 1986 accident and a number of persons alleged to have provided alcohol to Bradley Black. The damages sought in the New York ease included not only the injuries immediately caused by the accident itself but the brain damage and associated injuries resulting from the YNH surgery.
Billy Jacobs, as mentioned, was not the only person seriously injured in the October 1986 accident. Another passenger, Camille Graff, was seriously injured as well. At about this time, Graff commenced her own personal injury action in the New York courts. Although the record is not CT Page 11730 entirely clear on this point, it appears that the defendants in the Jacobs' New York action and the defendants in Graff's action were identical.
In June 1995, the common defendants in the Jacobs and Graff New York actions agreed to settle the two cases for the total of the available insurance proceeds. The total amount available for distribution pursuant to this agreement was $1,470,000. This amount was deposited in escrow. This amount was clearly inadequate even if applied for the benefit of Billy Jacobs alone, and Graff had serious injuries as well. The question of how to divide the proceeds was consequently a difficult one.
Graff and the Jacobs agreed to resolve the issue of the appropriate division of proceeds by arbitration. The agreement was that an arbitrator would determine the respective damages suffered by Billy Jacobs and Camille Graff. The proceeds in question — viz, the $1,460,000 held in escrow — would be divided according to ratio of the respective damages as thus determined. To this end, a joint order was filed on July 11, 1995 by a New York Judge, the Hon. Ralph A. Beisner, in the Jacobs and Graff cases. That order states, in full, as follows:
 The attorneys for the plaintiffs in each of the above entitled actions having appeared before this Court on the 27th day of June, 1995, and
 IT APPEARING that the above named plaintiffs have settled their claims as against all defendants to the above captioned actions and related actions, and
 IT APPEARING, that further proceedings are required to hear and determine the damages sustained by each of the above named plaintiffs and the distribution of the proceeds of the settlement with the defendants, and
 IT APPEARING, that it is in the best interests of William J. Jacobs, an incapacitated person, that the controversy between Camille Graff and William J. Jacobs as plaintiff concerning the distribution of the proceeds of the settlement be submitted to arbitration,
 NOW, on motion of Robert J. Lackaye, attorney for William J. Jacobs, an incapacitated person, and upon the consent of John J. Klarl, attorney for Camille Graff, for an Order pursuant to CPLR 1209 permitting the submission of the aforesaid controversy to CT Page 11731 arbitration, it is
 ORDERED, that William W. Jacobs and Arlene Jacobs, as conservators of the property of William J. Jacobs, an incapacitated person, are hereby authorized and empowered to proceed to arbitration before the Honorable Morton B. Silberman, as arbitrator, to hear and determine the damages sustained by each of the plaintiffs.
Following this order, submissions concerning the damages of the respective plaintiffs were made to Judge Silberman, the arbitrator. The submissions made on behalf of Billy Jacobs plainly encompassed the profound injuries resulting from his November 1986 surgery.
On November 22, 1995, Judge Silberman signed a written decision. That decision states, in full, as follows:
 On October 26, 1986 plaintiff William J. Jacobs and plaintiff Camille R. Graff sustained injuries in an automobile accident. Both plaintiffs were passengers in one of two automobiles involved in a collision. Actions brought by the plaintiffs have resulted in settlements to the extent that all insurance proceeds available have been deposited in escrow. However, the respective plaintiffs have been unable to agree on the amounts of money to be paid to each from the proceeds on deposit.
 By Order of this Court, and upon consent of the parties, the undersigned was designated to hear and determine the amount of damages sustained by each of the plaintiffs.
 Pursuant to said Order the undersigned has held hearings. Testimony was given by William W. Jacobs and Arlene Jacobs, the parents of William J. Jacobs who are also the conservators of the property of their said son. Testimony was also given by William J. Jacobs and Camille R. Graff. Also received in evidence were extensive medical and hospital records submitted by the parties.
 The evidence clearly establishes that plaintiff William J. Jacobs suffered catastrophic injuries and that plaintiff Camille R. Graff sustained serious CT Page 11732 injuries.
 Upon the evidence presented it is my determination that plaintiffs William J. Jacobs and William W. Jacobs and Arlene Jacobs, as parents and conservators of the property of William 3. Jacobs, sustained damages in the amount of EIGHT MILLION ($8,000,000) DOLLARS. It is my further determination that plaintiff Camille R. Graff sustained damages in the amount of SEVEN HUNDRED THOUSAND ($700,000) DOLLARS.
Because of Judge Silberman's decision, the Jacobs were entitled to 91.954 % of the proceeds held in escrow and Graff was entitled to 8.046% of those proceeds. By 1996, with the addition of accumulated interest, the proceeds had increased to $1,515,043.90. Following some minor deductions, $121,739.51 of these proceeds was payable to Camille Graff and her attorneys and $1,391,304.39 was payable to the Jacobs and their attorneys and lienholders. On March 27, 1996, Judge Beisner signed an order authorizing this distribution. On April 8, 1996, the New York case was withdrawn by stipulation.
The litigational history of the present case (which will sometimes be referred to as the "Connecticut case") must now be described. The Connecticut case was commenced by service of process on November 11, 1988. The original plaintiffs were William W. Jacobs and Arlene Jacobs both in their capacities as conservators of the estate of William J. Jacobs and in their individual capacities. The Jacobs later withdrew their individual claims, so only their claims in their capacity as conservators remain. The defendants are Yale University and YNH. The parties agree that there is no distinction between the two defendants concerning liability and that, if one defendant is liable, the other is liable as well.
The amended complaint is, for practical purposes, in two counts. (A third count, asserting individual claims of William W. Jacobs and Arlene Jacobs, was not pursued.) The first count is directed against Yale University and the second count is directed against YNH. These counts assert that the injuries sustained by William 3. Jacobs were caused by the failure of the respective defendants and their "servants, agents, and/or employees to exercise reasonable care and to exercise that degree of care and skill ordinarily and customarily used by physicians and surgeons under all of the circumstances then and there existing." There are several specifications of negligence, including allegations that the November 15, 1986 surgery "was contraindicated" and that the surgery was "improperly performed." CT Page 11733
On December 15, 1998, the defendants filed a Motion In Limine to Preclude Plaintiffs From Relitigating The Issue of Damages (No. 146). The motion asserted that, "Plaintiffs have previously litigated the issue of damages presented in this case at an arbitration proceeding conducted under supervision of the Supreme Court of New York." At the time this motion was filed, the record in the Connecticut case concerning the proceedings in the New York case was incomplete. After hearing argument, the Court determined that the appropriate judicial course was to allow the parties to litigate both questions of liability and damages to the jury without prior restriction and, in the event of a plaintiffs' verdict, to fully consider the issue by way of postverdict motion.
On December 28, 1998, following the Court's decision concerning the motion in limine, the defendants filed a special defense asserting that, "As a result of a prior proceeding, plaintiffs are barred by the doctrine of collateral estoppel from relitigating the issue of damages and from claiming damages in any amount other than $8 million, to the extent they establish liability." The parties and the Court agreed that the special defense would be litigated by way of postverdict motion rather than submitted to the jury.
The Connecticut case was tried to the jury. The evidentiary portion of the trial commenced on February 2, 1999. On March 4, 1999, the jury delivered a plaintiffs' verdict against both defendants. Because the damages in question had accrued after October 1, 1986 and before October 1, 1987, they were calculated in accordance with Conn. Gen. Stat. §52-572h(c) (1987) (popularly known as "Tort Reform I"). That statute provides that, "in a negligence action to recover damages for personal injury . . . accruing on or after October 1, 1986, if the damages are determined to be proximately caused by the negligence of more than one person, each person against whom recovery is allowed shall be liable to the claimant only for his proportionate share of the recoverable economic damages and the recoverable noneconomic damages . . . ."
The verdict contained the following findings:
 Past Economic Damages $1,000,000 Future Economic Damages $19,000,000 Past Non-Economic Damages $4,000,000 Future Non-Economic Damages $6,000,000 Total Damages $30,000,000 The jury further finds: (1) Amount of total damages caused only by the Defendants 0 (2) Amount of total damages caused both By the Defendants and Bradley Black $30,000,000 CT Page 11734 (3) The jury further finds: (a) Percentage of fault that proximately caused damages in category (2) attributable to defendants 90% (b) Percentage of fault that proximately caused damages in category (2) attributable to Bradley Black 10% (c) The Defendants' proportionate share of damages in category (2) is $27,000,000 Total damages chargeable to the Defendants $27,000,000
On April 29, 1999, the plaintiffs filed a Motion To Set Aside The Verdict (No. 177) "on the ground that the verdict includes a deduction based on apportionment of liability under circumstances where such apportionment is inconsistent with the facts and the law." On April 30, 1999, the defendants filed three motions: a Motion For Remittitur (No. 183), claiming both collateral estoppel with respect to the New York case and a variety of other arguments with respect to the claimed excessiveness of the damages awarded by the jury; a Motion To Set Aside Verdict And For A New Trial (No. 184), claiming both collateral and judicial estoppel and a variety of asserted trial errors; and (4) a Motion To Set Aside Verdict And For Judgment Notwithstanding The Verdict (No. 185), claiming both collateral and judicial estoppel and a variety of asserted trial errors.
The parties engaged in extensive posttrial discovery concerning the facts of the New York case and eventually executed a lengthy Amended Stipulation concerning those facts. The parties briefed the posttrial issues at considerable length.
The New York case was itself revisited during the posttrial litigation. The Jacobs plaintiffs filed a motion in the New York case requesting an order "clarifying" the decision of the arbitrator. "[NIL cross-moved to intervene in the Jacobs' post-judgment application. On February 4, 2000, the Hon. James D. Pagones denied both motions in a written decision. Judge Pagones reasoned that, "the action before this Court was not for medical malpractice as it is in the Connecticut action and therefore there is no substantive underlying common question of fact or law."
The postverdict motions in the Connecticut case were argued on August 8, 2000.
Postargument briefs were submitted on August 29, 2000.
III. DISCUSSION.
CT Page 11735
A. INTRODUCTION.
Some of the postverdict motions now before the Court assert claims previously considered by the Court. These claims can be discussed rather briefly. Other claims preeminently the defendants' collateral estoppel claim — have not been the subject of prior judicial consideration and must thus be discussed more extensively. Because the defendant's motions overlap to some degree, those motions will be addressed in terms of the issues they present.
B. THE PLAINTIFFS' MOTION TO SET ASIDE THE VERDICT.
The plaintiff's Motion To Set Aside The Verdict addresses an issue of apportionment under Tort Reform I. Conn. Gen. Stat. § 52-572h(c) (1987) provides that, "in a negligence action to recover damages for personal injury . . . accruing on or after October 1, 1986, if the damages are determined to be proximately caused by the negligence of more than one person, each person against whom recovery is allowed shall be liable to the claimant only for his proportionate share of the recoverable economic damages and the recoverable noneconomic damages." The present case is a negligence action to recover damages for personal injury accruing after October 1, 1986 (and before October 1, 1987, when Tort Reform I was superceded by Tort Reform II; 1987 Conn Acts 8 7-227). The jury could reasonably have found, as it did in fact find, that the damages in question were proximately caused by the negligence of both the defendants in this case and Bradley Black. The only question is whether Bradley Black is a "person" for purposes of Tort Reform I.
The plaintiffs argue that "person," as that term is used in Tort Reform I, means a person who is within the jurisdiction of the Connecticut courts. This interpretation finds no basis in the statutory text. Significantly, the statute in question contains a list of defined terms; Conn. Gen. Stat. § 52-572h(a) (1987); but the term "person" is not included in the list. Under these circumstances, the word must be given its plain and ordinary meaning and its natural and usual sense. In reDarlene C., 247 Conn. 1, 10, 717 A.2d 1242 (1998). The word "person" means "an individual human being." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1686 (1971). This definition obviously includes human beings residing in other jurisdictions, including Bradley Black. This construction is consistent with the manifest purpose of Tort Reform I, which is to make negligent tortfeasors responsible only for their "proportionate share" of the damages. It is also consistent with the expansive definition that the General Assembly has elsewhere given the term "person." See, e.g., Conn. Gen. Stat. §§ 1-1 (k); 53a-3 (1) (1999). CT Page 11736
The Court's decision to allow the defendants to seek apportionment of the damages in question with respect to Bradley Black was consistent with the controlling statutory text. The jury's finding was firmly grounded in the evidence. Under these circumstances, the plaintiffs' Motion To Set Aside The Verdict must be denied.
C. THE DEFENDANTS' MOTIONS.
1. The Effect of the New York Case.
a. The Full Faith and Credit Clause.
The question of the effect, if any, of the New York case on the verdict in the Connecticut case involves a constellation of legal issues. The first issue that must be addressed is one of Federal constitutional law. U.S. CONST. art. IV, § 1 provides that, "Full Faith and Credit shall be given in each State to the public Acts, Records, and judicial Proceedings of every other State." Is the decision of Judge Silberman entitled to full faith and credit under this provision? The question is important because to the extent that the Full Faith and Credit Clause is applicable, its application is mandatory, while application of the collateral estoppel doctrine claimed in the defendants' special defense can at least potentially involve an exercise of judicial discretion. SeeDean Witter Reynolds Inc. v. Byrd, 470 U.S. 213, 223 (1985).
This question was, for all practical purposes, answered in McDonald v.City of West Branch, 466 U.S. 284 (1984). McDonald involved the Federal Full Faith and Credit Statute, 28 U.S.C. § 1738. That statute, which dates from the Act of May 26, 1790, ch. 11, 1 Stat. 122; Kremer v.Chemical Construction Corp., 456 U.S. 461, 466 n. 6 (1982); provides that the "Acts, records and judicial proceedings" of the respective States "shall have the same full faith and credit in every court within the United States and its Territories and Possessions as they have by law or usage in the courts of such State, Territory or Possession from which they are taken." The Supreme Court stated in Kremer that, "Arbitration decisions . . . are not subject to the mandate of § 1738." TheKremer statement was, however, dictum because the administrative decision in that case had been confirmed by a reviewing court and was, consequently, given preclusive effect. McDonald, in contrast, involved an unconfirmed arbitration decision. The Supreme Court in that case elevated its dictum in Kremer to an unambiguous holding. The statement in Kremer,
it explained, "follows from the plain language of § 1738 which [applies to] judicial proceedings." 466 U.S. at 287. (Emphasis in the original.) "Arbitration," the court explained, "is not a "judicial proceeding' and, therefore, § 1738 does not apply to arbitration CT Page 11737 awards." Id. at 288.
Although McDonald involves the interpretation of the Federal Full Faith and Credit Statute rather than an interpretation of the Full Faith and Credit Clause itself, nothing in either the Constitutional text or the Court's jurisprudence suggests that this distinction is in any way important. The phrase construed, "judicial proceedings" is identical in both the statutory and the constitutional texts. Moreover, as mentioned above, the statutory text in question is practically coeval with the Constitution, having been enacted in 1790. The reasoning of McDonald is squarely based on the controlling text. Under these circumstances, that reasoning is fully applicable to the Full Faith and Credit Clause.
The remaining question is whether the proceeding before Judge Silberman is appropriately categorized as an "arbitration" or as a "judicial proceeding." This is something of a debatable point because, on the one hand, the matter was referred to Judge Silberman in his capacity as "arbitrator," and, on the other hand, Judge Silberman was, after all, a Judge. Judge Silberman's official capacity was, however, plainly that of an arbitrator. That is how the reference is phrased. Moreover, his decision was never confirmed by a court. The case was. instead, subsequently withdrawn. Under these circumstances, the fact that Judge Silberman was a Judge is unimportant. The preclusive effect given his decision should be no greater than the preclusive effect given the decision of an attorney arbitrator or a lay arbitrator chosen by the parties. The crucial distinction, for purposes of the Full Faith and Credit Clause, is the distinction between a judicially confirmed arbitration decision and an unconfirmed decision. See Cho v. AmericanBonding Co., 951 P.2d 468, 471 (Ariz.Ct.App. 1997), and authorities cited therein. The decision in question here is an unconfirmed arbitration decision. Whatever its collateral estoppel effect, it is not entitled to full faith and credit as a matter of Federal constitutional law.
b. Choice of Law.
The next issue which must be considered is that of collateral estoppel. Is the validity of the defendants' special defense to be determined by reference to New York or to Connecticut law? The parties have spilled much ink on this question, with the plaintiffs arguing for the governance of Connecticut law and the defendants contending that New York law controls. If Judge Silberman's decision had been a valid judgment, its preclusive effects would be controlled by New York law. I RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 95 (1971). That decision was not, however, a "valid judgment" for purposes of conflicts analysis since, as discussed above, it was delivered by an arbitrator rather than CT Page 11738 a court. See id., § 92(c). The question must be analyzed by reference to other criteria.
As it happens, neither party, after prodigious research, has been able to identify any meaningful difference between the relevant laws of the two states. The defendants' brief notes that, "[T]here is no material difference between the basic elements of a collateral estoppel defense in Connecticut and New York." Defendants' Post-Verdict Brief at 30 n. 32. The plaintiffs essentially agreed with this position at oral argument. While New York's collateral estoppel law is somewhat more detailed than that of Connecticut, the issue now before the Court is not one in which New York law dictates one result and Connecticut law dictates another. Rather, the issue now before the Court is a matter of first impression under the laws of either State and must be solved by reference to fundamental principles that are common to the laws of both States.
"Under modern conflicts-of-law theory, where there is a "false conflict' such that the laws of both states relevant to the set of facts are the same, or would produce the same decision in the lawsuit, there is no real conflict between them. . . . In such a case, the case ought to be decided under the law that is common to both states." Haymond v.Statewide Grievance Committee, 45 Conn. Sup. 481, 488-89, 723 A.2d 821
(1997), aff'd, 247 Conn. 436, 723 A.2d 808 (1998). (Internal quotation marks and citations omitted.) The Connecticut courts have adopted this position for well over a century. See Lockwood v. Crawford, 18 Conn. 361,370 (1847). Under these circumstances, at least as a formal matter, the defendants' claim is appropriately judged by Connecticut law. It must be understood, however, that, in this context, the judicial task necessarily requires reference to fundamental principles of the common law that are common to both States.
The formal use of Connecticut law as the governing standard will do no violence to modern choice of law analysis or the legitimate policy interests of New York. To the extent that the relevant policies of New York are important; see 1 RESTATEMENT (SECOND) OF CONFLICT OF LAWS,supra, § 6(2)(c); those policies will not be offended by the use of Connecticut collateral estoppel law. The New York Court of Appeals has recently explained that, in its view, "the doctrine of collateral estoppel rests on the interest of reducing needless litigation and conserving the resources of courts and litigants." David v. Biondo,703 N.E.2d 261, 263 (N.Y. 1998). In this case, the courts whose resources are allegedly taxed are Connecticut courts rather than New York courts. Moreover, in this case of "defensive collateral estoppel," the litigants whose resources are sought to be conserved — viz, the defendants — are Connecticut litigants rather than New York litigants. Under these circumstances, an interests analysis confirms what a "false CT Page 11739 conflict" analysis dictates in any event. The defendants' special defense is appropriately judged by Connecticut law.
c. The merits of the collateral estoppel defense.
The collateral estoppel defense asserted here arises in a peculiar factual setting for which no close analogues in the discoverable caselaw exist. The defendants seek to give preclusive effect to Judge Silberman's decision that the Jacobs plaintiffs in the case before him "sustained damages in the amount of . . . $8,000,000." The governing principles of law do not support the application of the collateral estoppel doctrine here.
The fundamental principles of collateral estoppel have been recently explained by our Supreme Court:
 The common law doctrine of collateral estoppel, or issue preclusion, embodies a judicial policy in favor of judicial economy, the stability of former judgments and finality. . . . Collateral estoppel means simply that when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit. . . . Issue preclusion arises when an issue is actually litigated and determined by a valid and final judgment, and that determination is essential to the judgment. . . . Also, the issue must have been fully and fairly litigated in the first action.
Walsh v. Town of Stonington Water Pollution Control Authority,250 Conn. 443, 460, 736 A.2d 811 (1999). (Internal quotation marks and citations omitted.) The application of these principles to the facts at hand raises several problems. Some of these problems are resolvable, but others are not.
The most readily resolvable problem is the fact that the issue in the present case is not "litigated between the same parties." Our Supreme Court abandoned the mutuality doctrine in Aetna Casualty Surety Co. v.Jones, 220 Conn. 285, 596 A.2d 414 (1991). "To allow a party who has fully and fairly litigated an issue at a prior trial to avoid the force of a ruling against him simply because he later finds himself faced by a different opponent is inappropriate and unnecessary." Id. at 302. Consequently, the fact that the collateral estoppel defense here is raised by persons not parties to the New York case is unimportant. CT Page 11740
A somewhat more complicated problem is raised by the fact that the listed plaintiffs in the New York and Connecticut cases are not identical. Judge Silberman's New York decision determines the damages sustained by "plaintiffs William J. Jacobs and William W. Jacobs and Arlene Jacobs, as parents and conservators of the property of William J. Jacobs." William W. Jacobs and Arlene Jacobs, in their capacity as conservators, were also plaintiffs in the Connecticut case, but William J. Jacobs was not. Although the discrepancy between the listed plaintiffs is troubling, the evidence submitted makes it clear that this is a distinction without a difference. For all practical purposes, William J. (Billy) Jacobs was the real plaintiff in each case. The claims made by his conservators in the Connecticut case were entirely claims made on his behalf. The same is true of the conservators' claims in the New York case. There is no indication in Judge Silberman's decision, or anywhere else in the evidence, that the addition of William J. Jacobs as an individual plaintiff made any difference in his finding. It is difficult to imagine what difference this could have made. Any damages sustained by Billy would necessarily be payable to his conservators. Under these circumstances, the fact that the New York and Connecticut cases involve somewhat different lists of plaintiffs does not affect the application of collateral estoppel.
The fact that Judge Silberman's decision has not been "determined by a valid and final judgment" creates a more difficult problem. The Connecticut Supreme Court has long held that a confirmed arbitration decision is "as conclusive as a court-rendered judgment" for purposes of the doctrine of res judicata. Corey v. Avco-Lycoming Division,163 Conn. 309, 318, 307 A.2d 155 (1972), cert. denied, 409 U.S. 1116 (1973). The same is true for purposes of collateral estoppel. Convalescent Centerof Bloomfield, Inc. v. Department of Income Maintenance, 208 Conn. 187,198, 544 A.2d 604 (1988). But a confirmed arbitration decision by definition involves a court "judgment." An unconfirmed arbitration decision, such as the one at issue here, does not. As mentioned, the New York case in question here was withdrawn following the arbitration. Does this make a difference? There is an obvious formalistic argument that it does. Under Connecticut law, as thus far enunciated, the collateral estoppel doctrine applies to "judgments," and the facts at issue here take us into territory not yet explored by our reviewing courts.
Corey, however, hints that a more functional argument should be used. That case says, in what is technically dictum (the arbitral decision at issue having been judicially confirmed). that, "No satisfactory reason can be assigned why an award; which the parties have expressly stipulated should be final as to the subject submitted, should not be as final as a court-rendered judgment." 163 Conn. at 318. Our Supreme Court has more recently stated, again in dictum, that "ordinarily a factual CT Page 11741 determination made in final and binding arbitration is entitled to preclusive effect." Genovese v. Gallo Wine Merchants, Inc., 226 Conn. 475,483, 628 A.2d 946 (1993). See Haynes v. Yale-New Haven Hospital,243 Conn. 17, 21 n. 5, 699 A.2d 964 (1997) (containing language to the same effect). These statements strongly hint that the presence or absence of a court judgment is not of the essence in cases involving the preclusive effects of prior arbitration. Although courts are divided on the subject, modern judicial opinion tends to support the proposition that an unconfirmed arbitral decision can have preclusive effect. SeeJacobson v. Fireman's Fund Insurance Co., 111 F.3d 261 (2d Cir. 1997), and authorities cited therein (construing New York law). Functionally, this proposition makes sense. If an issue fully litigated before an arbitrator, the arbitrator decides that very issue, and the parties have either accepted the arbitrator's decision as binding or are sufficiently satisfied with the arbitrator's decision that they do not challenge it in court, it is hard to see why the arbitrator's decision on that issue should not be as binding as a subsequent judicial confirmation of that decision. The judicial interests of economy, stability, and finality — the very interests that underpin the doctrine of collateral estoppel, Walsh v. Town of Stonington Water Pollution Control Authority,supra, 250 Conn. at 460 — are applicable in each setting. For these reasons, the fact that the New York case involves an unconfirmed arbitral decision does not preclude the application of the collateral estoppel doctrine.
The question of whether the issue was "fully and fairly litigated in the first action" must now be considered. Given the facts in the record here, this is an exceptionally close question. The problem is that the interests and expectations of both the parties and the arbitrator in the New York case were somewhat different from the interests and expectations characterizing the ordinary case.
It is helpful, in this regard, to compare this case with a more typical collateral estoppel case. If this had been a case in which the plaintiffs had sued one driver for the damages they had incurred in the automobile accident, won an award (arbitral or judicial) of $8,000,000, and then proceeded to sue the other driver or the providers of the alcohol in question in a second action, the argument for defensive collateral estoppel on the damages issue would be a forceful one. See Gionfriddo v.Gartenhaus Cafe, 15 Conn. App. 392, 405, 546 A.2d 284 (1988), aff'd onother grounds, 211 Conn. 67, 557 A.2d 540 (1989). The same would be true if the plaintiffs had sued one physician involved in the asserted medical malpractice, won an award of $8,000,000, and then proceeded to sue the hospital or another physician. If, in either case, the plaintiffs had gone on to actually collect the initial award, the issue of collateral estoppel would not even be reached. The case would then be resolved by CT Page 11742 reference to "the simple and time-honored maxim that [a] plaintiff may be compensated only once for his just damages for the same injury." Id.,211 Conn. at 71. (Internal quotation marks and citations omitted.) But these potentially dispositive facts do not occur here. There was no collection of $8,000,000, there was no award of that amount, and, even more importantly, there was never any expectation of receiving such an award.
Neither the parties in the New York case, nor the referring court (Beisner, J.), nor Judge Silberman himself were under any illusion that Judge Silberman was to give an award that could ever be collected, much less have preclusive effect in another case. The express purpose of the referral was to facilitate "the distribution of the proceeds of the settlement with the defendants." Judge Silberrnan's decision expressly acknowledges this fact. The evidence establishes that Judge Silberman was aware of the amount of the settlement proceeds in question. That amount was manifestly inadequate to provide full compensation to the plaintiffs in question. The arbitration in question was designed to divide that inadequate amount fairly among the competing plaintiffs. The arbitrator's findings concerning the damages sustained by the competing plaintiffs provided a means to this end but should not be confused with the end itself. The true focal point of the New York arbitration was a determination of the ratio between the damages sustained by the competing plaintiffs.
As mentioned, Judge Silberman found that the Jacobs damages were $8,000,000 and the Graff damages were $700,000. This finding produced the identical results that would have been produced had Judge Silberman found that the Jacobs damages were, say, $4,000,000 and the Graff damages $350,000 or, at another end of the spectrum, that the Jacobs damages were $80,000,000 and the Graff damages were $7,000,000. In each case, the dispositive factor would be the ratio of the damages sustained by the competing plaintiffs and not the absolute amount of those damages. If the ratio was correct, the accuracy of the damage findings themselves was unimportant. The parties here, following prodigious research, have been unable to locate any judicial decision giving collateral estoppel effect to a damages decision delivered under such circumstances.
There are, however, countervailing considerations that must also be weighed in the balance. Whatever the purpose of the referral to Judge Silberman may have been, Judge Silberman's marching orders came from the referral itself. That referral by (i.e. the referral by Beisner, J.) ordered Judge Silberman "to hear and determine the damages sustained by each of the plaintiffs." This is not an ambiguous order. The evidence establishes that this referral was not imposed on the Jacobs plaintiffs against their will but was drafted by their counsel (and drafted at a time when both the plaintiffs and their counsel were well aware of the CT Page 11743 pending Connecticut case). Judge Silberman's decision faithfully follows the terms of the referral by finding the "damages" sustained by the competing plaintiffs. In spite of the fact that the manifest purpose of the referral was to determine the ratio of the damages sustained by the competing plaintiffs, the referral itself nowhere directs the arbitrator to find that ratio, and the arbitrator, in consequence, never finds it. Neither the word "ratio" nor any ascertainable synonym appears in either the referral or the arbitrator's decision. Judge Silberman was instead asked to find the "damages, " and that is exactly what he found. Whatever the underlying purpose of the parties, the express purpose of the referral and the resulting arbitral decision was thus the determination of the "damages" sustained by the plaintiffs.
In addition, even though the parties to the New York case had no expectation of receiving or collecting an award of the damages found, the Jacobs nevertheless had an incentive to fully litigate the issue of damages. it is true that, given the amount of settlement proceeds available, the Jacobs had no hope of collecting the full amount of damages found by the arbitrator. Nevertheless, as the amount of the Jacobs' damages found by the arbitrator increased, so would their proportionate share of the $1.4 million settlement. This was an amount worth fighting for. For this reason, the Jacobs had an ample incentive to fully litigate the issue of damages in the New York case.
There is also no evidence that Judge Silberman's determination of damages was anything other than a good faith attempt to answer the very question put to him by the referral. While it is true that, as far as the parties were concerned, the important determination was the ratio between the damages sustained by the competing plaintiffs and not the absolute amount of those damages, and it is also true that Judge Silberman knew this, he was not ordered to find the ratio. He was ordered to find the amounts. Any suggestion that he made the very finding that he was ordered to make capriciously or in anything other than good faith is, on this record, sheer speculation.
Judge Silberman's findings as to damages cannot be dismissed as nonessential. Although the ratio of the competing damages was ultimately of supreme importance, that ratio could not be determined without a prior determination of the damages themselves. This is not a case in which the arbitrator's findings as to damages "have the characteristics of dicta."Dowling v. Finley Associates, Inc., 248 Conn. 364, 374, 727 A.2d 1245
(1999). (Internal quotation marks and citation omitted.) A determination of the amounts of the competing damages was essential to a determination of the ratio of those amounts. There can be no presumption that this decision was not "afforded the careful deliberation and analysis normally applied to essential issues." Scalzo v. City of Danbury, 224 Conn. 124, CT Page 11744 129 n. 5, 617 A.2d 440 (1992). (Internal quotation marks and citation omitted.) Under these circumstances, the arbitrator's finding as to damages was a determination essential to the judgment.
Another element of the doctrine of collateral estoppel must now be considered, and at this point the defendants encounter a hurdle they cannot overcome. This is the requirement of identicality. "Collateral estoppel . . . is capable of precluding a party from relitigating only issues and facts that actually and necessarily were determined in an earlier proceeding." Nancy G. v. Department of Children and Families,248 Conn. 672, 681-82, 733 A.2d 136 (1999). Consequently, "[t]o invoke collateral estoppel, the issues sought to be litigated in the new proceeding must be identical to those considered in the prior proceeding."Mazziotti v. Allstate Insurance Co., 240 Conn. 799, 812, 695 A.2d 1010
(1997). (Internal quotation marks and citations omitted.) On this record, the necessary showing of identicality cannot be made.
"To establish whether collateral estoppel applies, the court must determine what facts were necessarily determined in the first [easel, and must then assess whether the [party] is attempting to relitigate those facts in the second proceeding." Aetna Casualty Surety Co. v. Jones,220 Conn. 285, 297, 596 A.2d 414 (1991). (Internal quotation marks and citation omitted.) The record here shows that the facts necessarily determined in the first (New York) case were the damages sustained by the plaintiffs as a result of the October 26, 1986, automobile accident (the automobile accident damages) and that the facts litigated by the parties in the second proceeding were the damages sustained by the plaintiffs as a result of the November 15, 1986 surgery (the medical malpractice damages). The crucial question is whether the medical malpractice damages were necessarily a subset of the automobile accident damages for purposes of the New York arbitration.
There is little doubt that the medical malpractice damages could have been a subset of the automobile accident damages in New York. "Under New York law, persons who tortiously inflict personal injuries are liable not only for the injuries that they immediately cause but also for the aggravation of injuries through the subsequent malpractice of treating hospitals and doctors." Moller v. North Shore University Hospital,12 F.3d 13, 16 (2d Cir. 1993). See Glaser v. M. Fortunoff of WestburyCorp., 524 N.E.2d 413, 415 (N.Y. 1988), and authorities cited therein. But whether the medical malpractice damages were necessarily a subset of the automobile accident damages in New York is an entirely different question.
The defendants' contention that the answer to this latter question is in the affirmative largely rests on abundant evidence establishing that CT Page 11745 the Jacobs claimed most or all of the medical malpractice damages in their New York complaint and that the Jacobs presented considerable evidence concerning these damages to the arbitrator. Given this evidence, coupled with the substantive New York law already mentioned, there is little doubt that the arbitrator could have included the medical malpractice damages in his finding. The finding itself, however, makes no such statement. Moreover, the terms of the referral — which simply order the arbitrator to determine the "damages sustained" by the competing plaintiffs — do not facially require him to consider the medical malpractice damages. Whether the arbitrator in fact included the medical malpractice damages in his finding simply cannot be determined on this record.
In fairness, it must be acknowledged that the arbitrator's decision is not altogether sphinxlike on this issue. The decision itself contains two potential clues to this puzzle, each of which arguably favors the defendants' interpretation. One clue is the arbitrator's description of Billy Jacobs' injuries as "catastrophic." The other clue is the sheer amount of damages found viz. $8,000,000. Each of these clues suggests that the medical malpractice damages were included in the total damages found by the arbitrator. But neither clue is unambiguous on this point.
Billy Jacobs' post-surgical injuries are unarguably catastrophic. The problem is that, even if the sequela of the surgery are put to one side, the injuries that he sustained as a result of the automobile accident alone were sufficiently severe that they could plausibly be described as catastrophic as well. The accident in question was a horrendous head-on collision in which three people, including Billy's brother, were killed. The evidence establishes that, as a direct result of the automobile accident alone, Billy had well over a dozen broken bones, including a fractured femur, a pelvic fracture, and a shattered left elbow, all of which were exceptionally severe and will, by themselves, have extremely serious, crippling consequences for the remainder of Billy's life. Numerous serious orthopedic operations have been required as a result of these fractures, and additional orthopedic surgery is likely to be required in the future. Billy also sustained massive internal injuries in the automobile accident. He had been hospitalized in New York for 17 days prior to his transfer to YNH, and, at the end of this period, his progress had been unsatisfactory. In addition to these physical injuries, the emotional trauma associated with these injuries, and with the accident itself, was plainly enormous. Webster's dictionary defines "catastrophe" as "a momentous tragic usu[ually] sudden event marked by effects ranging from extreme misfortune to utter overthrow or ruin." It additionally defines "catastrophic" as "financially ruinous." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY, supra, at 351. Billy Jacobs' automobile accident injuries can plausibly be described in these terms. CT Page 11746
For similar reasons, the arbitrator's finding that the damages sustained by the Jacobs plaintiffs were $8,000,000 can plausibly be viewed as a finding involving the automobile accident damages alone. $8,000,000 would be a generous finding with respect to the automobile accident damages alone, but not outrageously so. The automobile accident injuries here were severe and crippling. Either a jury or a court could reasonably find that those injuries should be valued at $8,000,000. Beyond this, just as $8,000,000 would be a generous finding with respect to the automobile damages alone, it would be a fairly parsimonious finding with respect to the medical malpractice damages, certainly if those damages were to be combined with the automobile accident damages already discussed. Under all the circumstances, the arbitrator's finding of $8,000,000 damages is something of a wash. It can be used to support the arguments of either party, but it is far from dispositive of the question.
Judge Pagones' February 4, 2000 decision that "the action before this [New York] Court was not for medical malpractice as it is in the Connecticut action and therefore there is no substantive underlying question of law or fact" provides another textual clue to this puzzle, and this clue favors the plaintiffs' interpretation. Judge Pagones' decision manifestly suggests that the arbitrator's finding involved the automobile accident damages alone. This clue is not conclusive, having been authored by Judge Pagones rather than by the arbitrator himself When added to the considerations already described, however, Judge Pagones' decision at a minimum increases the plausibility of the argument that the arbitrator's finding of damages described the damages caused by the automobile accident damages alone.
This discussion should not be construed as an affirmative finding by this Court that Judge Silberman's decision involves the automobile accident damages alone. The critical point is that, on this record, no affirmative finding can confidently be made either way. Under these circumstances, the law is clear that it is the opponents of collateral estoppel who must be given the benefit of the doubt.
The general standard governing the question of identicality in collateral estoppel cases is that of Ashe v. Swenson, 397 U.S. 436
(1970). Where a previous judgment has been based on a general verdict, the court must "examine the record of a prior proceeding, taking into account the pleadings, evidence, charge, and other relevant matter, and conclude whether a rational jury could have grounded its verdict upon an issue other than that which the defendant seeks to foreclose from consideration." Id. at 444. (Internal quotation marks and citation omitted.) Although Ashe was a criminal case, this rule, or something very CT Page 11747 much like it, applies in civil cases as well. See Dowling v. FinleyAssociates, Inc., 248 Conn. 364, 377, 727 A.2d 1245 (1999). Dowling
reasons that "a general verdict is not entitled to collateral estoppel effect where there is no way to ascertain the precise basis of the jury's determination in a prior adjudication."
The prior decision in question here is that of an arbitrator rather than a jury. For purposes of determining its preclusive effect, however, the arbitrator's decision here is closely analogous to a general verdict returned by a jury. There is no way to confidently ascertain the precise basis of the arbitrator's determination of damages. Like the verdict found to lack preclusive effect in Dowling, the arbitrator's decision leaves open to speculation the precise issue on which the arbitrator may have rested his decision. Where, as here, "there is more than one possible reason for the [arbitrator's finding], and the court . . . cannot say that any one is necessarily inherent in the [finding], the doctrine of collateral estoppel is inapplicable." Dowling, supra,248 Conn. at 377. (Internal quotation marks and citation omitted.)
For the reasons explained above, the defendants' special defense of collateral estoppel ultimately rests on speculation concerning the issue decided by the arbitrator in the New York case. On this record, that defense cannot succeed.
2. The Jury's Claimed Calculation Error.
Another issue asserted by the defendants in their postverdict motions that has not been the subject of previous judicial consideration in this case involves a claimed calculation error in the jury's computation of future economic damages. As mentioned, the jury found that the plaintiffs' future economic damages were $19,000,000. The thrust of the defendants' postverdict argument is that this amount exceeds the calculations of Dr. Gary Crakes, an economist who testified as an expert witness called by the plaintiffs. Dr. Crakes testified that Billy Jacobs total economic loss — both past and future — amounted to $18,265,156. He later testified that past economic damages accounted for $217,686 of this amount. The future economic damages, according to Dr. Crakes' calculations, would consequently be $18,047,470. The jury's finding of $19,000,000 for this amount thus exceeds Dr. Crakes' calculations by $952,530, or by approximately 5.3%. While the difference is significant in terms of the amount of money involved, it is not particularly significant when expressed in terms of a percentage. Should the jury's verdict be adjusted to correct this asserted error? The answer is plainly No.
While the jury's future economic damages award was higher than the CT Page 11748 calculations of the plaintiffs' expert, the difference here is not so great as to shock the conscience, nor does it deviate substantially from what could be considered a reasonable amount. The evidence could reasonably allow the jury to conclude that Billy Jacobs' medical malpractice injuries are horrendous in the extreme. Not only will he be utterly unable to earn any money during the remainder of his life, but more significantly, he will never achieve independence. He will require intensive care, supervision, and therapy for the rest of his life. No expert, however qualified, can estimate the exact amount of the resulting economic damages with any real precision. The jury heard all of the evidence in this case, and was not required to slavishly follow the testimony of any one witness. It was not even required to believe that witness. In light of all the evidence, the jury's finding was a reasonable one. Under these circumstances, there is no basis to disturb its award. See Tyler v. Bethlehem Steel Corp., 958 F.2d 1176, 1190 (2d Cir. 1992).
3. The Discount Rate Issue.
A third issue that has not been the subject of prior judicial consideration involves the discount rate allegedly used by the plaintiffs' economist, Dr. Crakes. The defendants argue in their postverdict brief that, "Dr. Crakes committed a crucial error by failing to discount his damage calculation back to present value at a proper discount rate. Instead, he assumed that market interest rates would be totally offset by inflation and therefore used a 0% discount rate — an approach that disregards sound economic principles." Defendants' Brief at 52-53. As the defendants admit in their brief, however, "his testimony was admitted without exception." Id. at 53 n. 25.
The short answer to this contention is that if the defendants perceived a problem with Dr. Crakes' methodology, the proper forum in which to attack that methodology was at the trial, by cross-examination of the witness in question and, if appropriate, by the contrary testimony of a rival expert witness. What is not appropriate is an attack on the testimony in question by way of postverdict motion. This is posttrial litigation by ambush, which, in the spectrum of litigational sins, should receive even less judicial approbation than trial by ambush. In our judicial system, the trial is the "main event," rather than a "tryout on the road." Wainwright v. Sykes, 433 U.S. 72, 90 (1977).
The calculation of appropriate discount rates is, in any event, well outside the scope of judicial expertise. It is, at best, an evidentiary matter for the jury to determine upon consideration of the evidence. The defendants' argument here is not an appropriate ground for reducing or CT Page 11749 setting aside the verdict.
4. Claimed Errors in the Charge.
The defendants claim error in the failure of the court to give three requested jury instructions. One requested charge, which has been briefed and argued at considerable length, involves the New York law pertaining to the administration of medication by home health aides. A second requested charge asked the Court to instruct the jury that it could not find liability on the basis of the sequence of clamping during the surgery in question. The third requested charge involved the potential adjustment of the verdict due to the New York litigation.
"[T]he setting aside of a verdict by the trial judge for an error in his instructions to the jury is a power which should be exercised by him with great caution, and never unless he is entirely satisfied that his error is unmistakable and must have been unquestionably harmful." Gaulv. Noiva, 155 Conn; 218, 220, 230 A.2d 591 (1967). See Brunetto v. RoyalExchange Assurance Co., 126 Conn. 569, 272, 13 A.2d 138 (1940), and authority cited therein. The requested charges were the subject of a lengthy charge conference and spirited argument at the time of trial. The Court determined at the time that its charge was correct in law and appropriate with respect to the evidence, and the additional volumes of argument delivered after the fact have not altered that view. The Gaulv. Noiva criteria are not satisfied here. Under these circumstances, the verdict will not be set aside on the basis of the claimed errors in the charge.
5. The Claimed Conflict in the Testimony of the Plaintiffs' ExpertWitnesses.
The final postverdict claim that requires discussion in any detail is the defendants' claim that the verdict should be set aside because the testimony of three of the plaintiffs' expert witnesses was in conflict. Two of the witnesses in question, William Walker and Mitchell Mills, were board certified cardiothoracic surgeons, called by the plaintiffs on the issue of liability. Each of these witnesses testified that, in his opinion, the defendants had breached the applicable prevailing professional standard of care and that that breach was the proximate cause of Billy Jacobs' injuries. The precise reasoning of these witnesses was not entirely identical. Dr. Walker testified that testified that, in his opinion, the surgery was unnecessary, that the operation should have been stopped once the aorta was seen, and that the hemorrhage was caused by improper been stopped placement of the clamps. Dr. Mills testified that, in his opinion, the decision to operate was not in the standard of care, that the operation should have been stopped once no evidence of damage CT Page 11750 was seen outside the mediastinal pleura, and that once the aortic repair was commenced, the operation was botched in a number of ways, including the placement of the clamps and the sequence of the clamping. The witnesses disagreed on their reading of Billy Jacobs' aortagram, but agreed on much else, including their common opinion that the operation should not have been undertaken in the first place and that, once it was undertaken anyway, it was not performed within the prevailing professional standard of care. The defendants subsequently presented the deposition testimony of a third witness, David Tice, also a board certified surgeon, who had reviewed the case at the request of the plaintiffs in 1989 and had not concluded that the defendants were negligent. The defendants now assert that, because the testimony of these witnesses was, in their opinion, in irreconcilable conflict, the verdict should be set aside.
The question of whether the opinions of Dr. Walker and Dr. Mills were, as the defendants claim, in irreconcilable conflict was ultimately grist for the jury's mill. The fact that two expert witnesses produced by the same side may disagree on some points, even some important points, is not an appropriate ground to prevent the jury from performing its quintessential function of sifting the evidence. Juries are presented with conflicting testimony all the time. It is not uncommon, to take an everyday example, for two bystander witnesses in an automobile accident case to have quite different memories of the event in question. A party may have strategic considerations as to whether it will choose to call all possible witnesses to the stand and thus present arguably conflicting evidence, but a party choosing to do so should not be penalized by the court. The interests of justice should encourage, rather than discourage, a full presentation of evidence. It is for the jury to decide who is credible and who is not.
To return to this case, if the plaintiffs had presented only the testimony of Dr. Walker or only the testimony of Dr. Mills, the defendants would not be in a position to make the argument they now make. (The fact that Dr. Tice may have held a conflicting opinion is of little consequence, for his testimony was offered by the defendants; the proposition that the plaintiffs' case could not go to the jury because the defendants offered contrary opinion evidence is completely unpersuasive.) The interests of justice would not be served by a rule that penalized the plaintiffs for offering both. Because the plaintiffs chose to offer both, the jury ultimately had a more substantial body of evidence, and a greater fund of expertise, to consider in reaching its verdict. The defendants' argument is presumably grounded in concerns about the reliability of the resulting verdict, but the overall reliability of jury verdicts is likely to be enhanced by increasing, rather than decreasing, the amount of probative evidence in the case. CT Page 11751
The principal authority relied on by the defendants is Mudano v.Philadelphia Rapid Transit Co., 137 A. 104 (Pa. 1927). Mudano reasons that cases requiring "special scientific knowledge" for their solution are different from more routine cases "on the border line between the domain of general and special knowledge, as, for example, where the value of a thing or of a service is the point at issue." In the more routine category of cases, "the jurors, as men of affairs, may draw their own inferences from the established facts and either accept or reject the guidance of experts," while in more "scientific" cases, "the jurors are dependent on expert evidence to enable them intelligently to reach a decision." Consequently, in this latter class of cases, "If plaintiff calls more than one expert, there must be no absolute contradiction in their essential conclusions; for . . . it is his duty to furnish consistent, and not inconsistent, advice — otherwise the jury would be confused rather than instructed." Id. at 107. This authority, however venerable, does not provide an appropriate ground for setting aside the verdict here.
The rule of Mudano has been modified even in the state of its birth. The Supreme Court of Pennsylvania has more recently held that a "relatively minor divergence in only part of[a party's] expert testimony, when viewed against the testimony as a whole" does not "justify removal of this issue from jury consideration." Brannan v.Lakenau Hospital, 417 A.2d 196, 200 (Pa. 1980). See Gorfti v.Montgomery, 558 A.2d 109, 111 (Pa.Super.Ct.), allocatur denied,569 A.2d 1367 (Pa. 1989). The rule has not been accepted in other jurisdictions. See Kosberg v. Washington Hospital Center, Inc.,394 F.2d 947, 950 (D.C. Cir. 1968), and authorities cited therein. For present purposes, however, a jurisdictional headcount is less important than the fact that Mudano's reasoning is wrongheaded on its own terms.
Mudano accepts the fact that opinion witnesses presented by the same party can offer conflicting testimony about issues like value because the jurors "as men of affairs" can "draw their own inferences from the established facts" to come to the correct conclusion. 137 A. at 107. But even in "scientific" cases (medical malpractice cases being a good example), expert opinion testimony is based on facts either observed by the expert and described in his testimony or assumed by the expert and established by other evidence. Consequently, as the New York Court of Appeals has cogently explained, "[t]here will . . . be a factual matrix against which the jury decides which opinion it deems acceptable and which, together with the accepted opinion, will, in all but the most unusual case, provide the basis upon which a rational trier of fact can [reach a conclusion]." People v. Jackson, 480 N.E.2d 727, 732 (N.Y. 1985). (Footnote omitted.) Viewed in this light, conflicting expert CT Page 11752 opinion testimony is a less serious matter than conflicting factual testimony. of course, juries hear conflicting testimony of either description all the time. The fact that two or more witnesses, even expert witnesses presented by the same party, may give conflicting testimony "simply creates a credibility question for the jury . . . to be determined by them in the context of the entire body of evidence before them." Id.
For the reasons just discussed, the Mudano rule is inconsistent with modern notions of jurisprudence and is not be adopted here. Any inconsistencies between the opinions of Dr. Mills and Dr. Walker were matters for the jury to consider in light of all the evidence presented in the case The verdict should not be set aside on this basis.
5. Other Claims by the Defendants.
The defendants make several other claims' in their motions and briefs, but none of those claims merit further discussion here. Most or all of those claims were previously the subject of judicial rulings, after full argument, during the course of the trial, and all of those claims are rejected here.
In sum, there is no persuasive reason to set the jury's verdict aside or grant a new trial.
IV. CONCLUSION.
All motions identified in the heading of this opinion are denied in their entirety
Jon C. Blue Judge of the Superior Court
CT Page 11752